## P. DOUGHERTY CO. v. 2471 TONS OF COAL EX BARGE ANNAPOLIS.

(District Court, D. Massachusetts. February 25, 1922.)

No. 1773.

1. **Shipping ☞45—"Default" in charter party means failure to comply with agreement to complete loading.**
"Default," as used in a charter party in the common form, does not mean "fault," but merely failure to comply with the agreement to complete loading in the stipulated time; the only exception being vis major or its equivalent.
[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Default.]

2. **Shipping ☞39—Losses caused by government interference left where they fall.**
Generally speaking, losses caused by government interference with the performance of charter parties are left where they fall, and are not to be transferred from one person to another, unless the latter has contracted to take the risk of them, or is otherwise obliged to do so.

3. **Shipping ☞39—Charterer does not warrant that there will be no detention.**
A charterer does not warrant that there shall be no detention.

4. **Shipping ☞52—Charterer held not liable for detention through government interference.**
A charterer of a ship with a cargo of coal *held* not liable for delay in loading caused by interference of the government, preventing the obtaining of a permit to load, though at the time of the making of the charter party coal was under government control.

5. **Shipping ☞52—Charterer held liable for delay caused by congested condition of port and action of government.**
Where government held up loading of coal for some time, and the harbor became congested before the government allowed permits to be issued, a charterer of a ship with a cargo of coal was liable for demurrage after the permits were issued, though the government retained control and determined the order in which the vessels should be loaded.

In Admiralty. Libel by the P. Dougherty Company, owner of the barge Annapolis, against its cargo, to recover freight and demurrage. Decree for libelant.

Blodgett, Jones, Burnham & Bingham and Fred'k W. Eaton, all of Boston, Mass., for libelant.

P. G. Carleton, of Boston, Mass., for claimant.

MORTON, District Judge. This is a libel brought by the owners of the barge Annapolis against its cargo to recover freight and demurrage. The freight has been paid, and the only question now before the court is whether demurrage is due. The case was heard on a statement of agreed facts and the oral testimony of the master of the barge. The essential facts are as follows:

The charter party was executed on November 29, 1919; a copy of it is annexed to the libel. By its terms the barge was to proceed to Sewall's Point, Norfolk, Va., and there load a cargo of coal for Boston; the charterer (the Eastern Massachusetts Street Railway Company) was to have five days for loading and discharging cargo, to commence when the master should report the barge ready to receive or discharge. There was the following provision about demurrage:

"For each and every day's detention beyond said time by default of said party of the second part or agent, ten cents (10¢) per ton on bill of lading weight per day and pro rata for portion of a day shall be paid by said party of the second part or agent, to said party of the first part, or agent."

At the time when the charter party was made, and during the period covered by this controversy, because of a strike of the miners in the bituminous coal fields, the United States government, through its Railroad and Fuel Administration and other agencies, had taken control over shipment of coal by water. It exercised absolute control over the delivery and loading of coal at Sewall's Point, and prohibited the loading of coal upon any vessel unless a permit therefor had been issued and was in force.

Prior to the charter party the street railway company had secured the necessary permit for loading the Annapolis. While she was on her way to Sewall's point to load, this permit was revoked. When she arrived there and reported for loading on December 6, 1919, at 9:30 a. m., the charterer had no permit, and it was therefore impossible to load her.

This state of affairs continued—the barge lying at anchor in the harbor ready at all times to load—until December 12, 1919, at 3:45 p. m., when the charterer obtained the necessary permit. On the same day, however, 42 other permits were issued for other vessels. About 30 vessels were in the harbor for loading when the Annapolis arrived, and by the time the permit was obtained 10 more had come in. Docking facilities were too limited to take care of such a large number promptly, and it was not until 10 days later, on December 22, 1919, at 10:30 a. m., that the Annapolis was docked for loading, which was completed that evening at 9:45 p. m. The docking and loading were under the control of the government. The Annapolis was not loaded in turn. About half a dozen vessels arriving after her were loaded before her. The claimant had a cargo of coal waiting to be loaded all the time the barge was in port, but was unable to put it on board for the reasons stated.

The question is whether there was any detention of the barge "by default of the party of the second part"; i. e., the charterer. For convenience of discussion the period may be divided into two parts: First, from the arrival on December 6th until the permit was obtained on December 12th; second, from December 12th until the loading on December 22d. Aside from these delays, the barge was loaded and discharged within the lay days specified by the charter party.

[1] The charter party is in a common form. The provision in question has often been considered by the courts, and the general meaning of it is well settled:

"'Default' does not mean 'fault,' but merely failure to comply with the agreement to complete the loading in the stipulated time. The only exception is vis major or its equivalent." So. Trans. Co. v. Unkel (D. C.) 236 Fed. 779.

In that case it was held that prevention of loading by severe weather conditions did not excuse the charterer. See, too, Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106; The Olaf (D. C.) 248 Fed. 807; M. O. H. of W. I., Inc., v. C. Hannevig, Inc. (C. C. A.) 264 Fed. 311.

[2] The real controversy is whether the circumstances stated constitute "vis major or its equivalent," and this depends upon the correct interpretation of the charter party. Government control of business is very apt to cause heavy losses to persons engaged in the business controlled. That was so in this instance; there is a large out of pocket loss, which somebody must bear. Generally speaking, losses caused by government interference with the performance of contracts are left where they fall; they are not to be transferred from one person to another, unless the latter has contracted to take the risk of them, or is otherwise obliged to do so. The Juno, [1916] L. R. Prob. Div. 169; Met. Water Board v. Dick, [1918] App. Cas. 119. If the barge had been prevented from loading by the government after the charter party had been entered into, the charterer would have had no action against her or her owners and, as between the parties, must have borne the resulting loss (Cunningham v. Dunn [1878] L. R. 3 C. P. 443); and the same principle would clearly apply relieving the charterer if the specified cargo were a definite object, and it were taken by the government, or if the charterer were prevented from loading cargo by government action taken subsequent to the charter, as was decided in Reed v. Haskins, 26 L. J. Q. B. 5. Here all of the commodity constituting the cargo was, as both parties knew, under government control at the time of the charter. Does this circumstance differentiate the case from those referred to and require a construction of the charter party under which the charterer took the risk of being unable to furnish the cargo because of government interference?

[3] No case exactly in point has been called to my attention. It is well settled that the charterer does not warrant that there shall be no detention:

"The term 'default' employed in that relation in the charter parties signifies failure on the part of the charterers to do or perform some duty or act which they have stipulated or are bound in pursuance of their contractual relations to do or perform. The term cannot be so broadly interpreted

as to include all manner of causes of detention or delay, whether arising from act or omission in the discharge of duty on the part of the charterers or not. In other words, the contract is not absolute that there shall be no detention beyond a certain day for any cause, but that there shall be no detention on account of the failure of the charterers to perform their contractual obligations with the vessel or its owners." Wolverton, J., Washington Marine Co. v. Rainer Mill & Lumber Co. (D. C.) 198 Fed. 142.

It has been decided in England that the seller for export of an article then under government control does not undertake absolutely to obtain the necessary permit, but only to use reasonable diligence to do so, and is not liable for failure to deliver if, on making proper efforts, it is unable to obtain a permit. Anglo-Russian Merchant Traders v. Batt & Co., [1917] 2 K. B. 679. The obligation of a seller to deliver the goods sold to the buyer is somewhat analogous to that of the charterer to deliver cargo to the vessel.

[4] The basis of liability in the charter party is "default" on the part of the charterer, which means, as the Washington Marine Co. Case, supra, shows, a failure to fulfil an obligation imposed by the contract. There is nothing in the language of the charter party on which an absolute agreement on the part of the charterer can be found; and while strong reasons can be given for holding that the charterer whose business it is to furnish the cargo—a matter over which the vessel has little or no control—should be held to take the risk of government interference with the loading, and the question is by no means free from doubt, I do not think that the equities in favor of the vessel are so preponderant as to justify implying such an agreement from the circumstances under which the charter party was made. The charterer was bound, as held in the Anglo-Russian Merchant Traders Case, supra, to use due diligence to obtain the necessary permit. As it appears to have done so—indeed, no contention is made to the contrary—and as when the barge left Boston, there was no reason to anticipate that the permit would be revoked, the charterer is not liable for the detention prior to the issue of the permit.

[5] The remaining question is whether the charterer is liable for the detention between the issue of the permit on December 12th and the loading on December 22d. While the evidence on the point is not very conclusive, I infer, as the defendant contends, that the time when a waiting vessel should be loaded was determined by the government officials. It does not appear that the permits specified the turn in which the vessel should be loaded; apparently all permits ranked equally. The principle on which turns were awarded does not appear; it may have depended on the necessities of the community to which her cargo was destined, and perhaps to some extent on the character and size of the vessel. The charterer had no control over it. If there had been no other vessels waiting, the Annapolis could easily have been loaded by 6 p. m. of the day following that on which the permit was issued. Her detention thereafter was due to the congestion of the port, both at the time of her arrival and when the permit was issued. It was therefore the result of two causes: (1) The large number of vessels to be loaded; and (2) the turn among them which she was accorded by the officials in charge.

It is well settled that for delays due to the congested condition of a port charterers are responsible; the risk of that is upon them, not upon the vessel. This is true, even though the cause of it was unforeseen and beyond their control. W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126. The detention of the Annapolis after 6 p. m. on December 13th was therefore "by default," as those words have been construed, on the part of the charterers, for which they are liable. It was not directly and solely due to government intervention and control. It seems to me that the usual rule should be applied and that the charterers are liable for demurrage for this period. In The Kingsland, 12 Aspinwall, Mar. Cases, 38, and Weir v. Richardson, 3 Com. Cases, 20, there was no congestion in the ports, and the delay was due to no cause but failure of the government agents to act promptly or carefully. Those decisions seem to me distinguishable from the present case. It may be that the English law, as stated in The Kingsland, supra, is not in accord with the American law, as laid down in the W. K. Niver Coal Co. Case, supra, by which I am, of course, bound.