## INTER-COAST S. S. CO. v. SEABOARD TRANSP. CO.

(Circuit Court of Appeals, First Circuit. June 21, 1923.)

### No. 1608.

**1. Shipping ⬅45—Charterer held required to obtain permit for loading of coal.**

   A charter party, in which the charterer agreed to provide and furnish the vessel with a full cargo of coal, impliedly required it to do every lawful act necessary to provide the coal, and therefore required it to procure a government permit for the loading of the coal, which was necessary to enable it to fulfill its obligation, and the obtaining of which was not illegal.

**2. Shipping ⬅179—Government restrictions on loading coal held not to excuse delay in furnishing cargo.**

   Where the charterer of two vessels to carry cargoes of coal knew when the charter party was entered into that a permit to load the coal would be necessary and that the regulations for procuring it were subject to modification by the Fuel Administrator, and were constantly becoming more stringent, but did not have inserted in the charter a clause excluding delay for inability to procure the permit, it cannot avoid liability for demurrage during the time the permit was withheld, on the ground that the furnishing of the cargo was prevented by vis major.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Libel in admiralty by the Inter-Coast Steamship Company against the Seaboard Transportation Company to recover demurrage. From a decree allowing demurrage for only part of the time claimed, libelant appeals. Reversed and remanded.

Robert G. Wilson, Jr., of Boston, Mass. (Eaton & McKnight, of Boston, Mass., on the brief), for appellant.

Mortimer Boyle, of New York City (Emory R. Buckner, Clarence M. Tappen, and Root, Clark Buckner & Howland, all of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, JJ.

BINGHAM, Circuit Judge. This is an appeal from a decree of the District Court for Massachusetts in an admiralty proceeding brought by the owner of the steamships Maruba and Briton against the charterer, to recover demurrage. In the District Court it was ruled that the owner was not entitled to demurrage for the periods during which loading was interrupted through the lack of the necessary government permits, but was entitled to demurrage for delays beyond the lay days

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

occasioned by congestion in the port, and entered a decree accordingly. It is from this decree that the owner has appealed, and the question is whether, under the terms of the charters and the circumstances surrounding the parties at the time they were entered into, the District Court was right in holding that the owners were not entitled to demurrage due to delays occasioned by the lack of the necessary permits— 6 days and 6 hours for the Maruba, and 8 days and 12 hours for the Briton.

The charter party of the Maruba was executed November 19, 1919. According to the charter the vessel was undergoing repairs at Boston, and was expected to proceed about November 25 to Hampton Roads, Va., to receive a cargo of coal for Fall River, New Bedford, or Boston, Mass., or Portland, Me.; that the charterer engaged "to provide and furnish the said vessel a full cargo of coal, * * * and to pay * * * for the use of said vessel during the voyage aforesaid $1.75 if sent to Fall River or New Bedford, $2 Boston, $2.15 Portland, per ton of 2,240 pounds." "Cargo to be loaded and discharged free of expense to vessel, but vessel to pay the expense of trimming cargo at loading port." The charterer was to have three days for loading and discharging, the same to commence when captain should report the vessel ready to receive or discharge. As to demurrage, it was provided:

"For each and every day's detention beyond said time by default of the said party of the second part [charterer], or agent, twenty-five cents per ton on bill of lading weight per day and pro rata for portion of a day, shall be paid by said party of the second part, or agent, to said party of the first part [owner], or agent."

The charter also contained the following provision:

"The act of God, of public enemies, the dangers and risks of the seas of every kind mutually excepted."

The charter party of the Briton was substantially the same as the charter of the Maruba. It contained, however, a provision that, on signing the bill of lading, one of the ports of destination should be named. It was dated November 28, 1919, and stated that the vessel was due at New Bedford that day, and upon completing discharge would sail to report under the charter.

At the time when these charter parties were made, and during the period covered by this controversy, the United States government, through its Railroad and Fuel Administration, and other agencies, because of a strike in the bituminous coal mines, had taken control over the shipment of coal by water. It exercised absolute control over the delivery and loading of coal at Sewall's Point, Hampton Roads, Va., where the delivery and loading of the coal in question was to be had, and prohibited the loading of any vessel there unless a permit therefor had been issued by its agencies and was in force.

It appears that, prior to the execution of the charter (of November 19, 1919), for the Maruba, the charterer applied orally to the regional coal committee at Roanoke, Va., through the New England subcommittee at Boston, for a permit to load her with 2,800 tons of bituminous coal, which it had to its credit in the possession of the Director General of Railroads at Hampton Roads, to be transported to Fall River

and there delivered to the American Printing Company, a customer of the sixth or seventh class specified in the priority list of the Fuel Administration, and requesting delivery to the vessel on or about the 26th day of November, 1919; that it received assurance from the New England subcommittee that a permit would issue upon formal written application therefor filed in accordance with the regulations; that, written application having been made, a permit was issued on November 20, 1919, by the regional coal committee at Roanoke; that the vessel sailed from Boston on December 6, 1919, and arrived at Sewall's Point on the 9th day of December, 1919, at 10 a. m., and thereupon reported that she was ready to receive cargo; that on December 2, 1919, four days before she sailed from Boston, the regional coal committee revoked all permits issued for delivery of coal at Hampton Roads, including that for the Maruba; that on December 15, 1919, at 4 p. m., at the charterer's request, a permit was issued to load coal on the vessel for shipment to the Boston & Maine Railroad Company (a customer of the first class); that in canceling the original permit the regional coal committee acted in accordance with the instructions of the central coal committee, which regulated and controlled shipments from Hampton Roads to New England ports, and issued permits therefor under the orders, rules, and regulations of the Fuel Administration; that the vessel was detained by the charterer at Hampton Roads from the time of its arrival until 11:15 a. m., December 21, 1919, when it was completely loaded; and that from the time of reporting on the 9th day of December, 1919, at 10 a. m., until the 15th day of December, 1919, at 4 p. m., when the new permit was issued, the charterer made no use of the vessel. It is for the detention by the charterer during this period of 6 days 6 hours that the owner claims demurrage in addition to that allowed it by the District Court.

As to the Briton, it appeared that the charterer, prior to the execution of the charter party of November 28, 1919, made oral application through the same committees for a permit to load the vessel with 3,200 tons of bituminous coal which it had to its credit in the possession of the Director General of Railroads at Hampton Roads, to be transported to New Bedford, and there delivered to David Duff & Son, a customer of the fifth class in the priority list; that in this oral application delivery to the vessel was requested to be made on or about December 2, 1919; that they were assured by the New England committee that a permit would issue on formal written application being filed in accordance with the regulations; that written application was filed on November 29, 1919, and that a permit was forthwith issued by the regional coal committee at Roanoke; that on the 28th of November, and before the permit was issued, the Briton proceeded to Hampton Roads and reported for cargo at Sewall's Point on December 3, 1919, at 10 a. m.; that this permit, as well as all other permits for loading at this place, was canceled on the 2d day of December, 1919; and that no further permit was obtained until the 11th day of December, 1919, although the charterer was at all times insisting on a permit to load for said David Duff & Son, which was obtained on that date; that in canceling the permit, the regional coal committee acted under

the instructions of the central coal committee; that the vessel was detained at Hampton Roads by the charterer from the time of its arrival, December 3, 1919, at 10 a. m. until December 11, 1919, 10:30, when a permit was obtained and loading begun, without the charterer having made any use of the vessel. It is for this period of 8 days and 30 minutes that the owners also claim demurrage, in addition to that allowed by the District Court.

It further appeared that, during the war, power was granted the President under the National Defense Act of August 10, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r) to control the coal industry, and that this power was exercised through the Fuel Administration; that after the Armistice, and until October, 1919, the shipment and distribution of coal was practically unrestrained; that because of the coal strike late in 1919 the government resumed its control of the coal industry under the National Defense Act; that on October 30, 1919, the President issued an executive order restoring the powers of the Fuel Administrator, in which he stated:

"Inasmuch as it is contemplated that it may be necessary from time to time * * * to restore in full force and effect rules, regulations, orders, * * * or portions thereof, regulating the * * * shipment, distribution, apportionment * * * or use of * * * coal, the fuel administrator shall, as occasion arises, restore, change or make such rules or regulations relating to the * * * shipment * * * of * * * coal as in his judgment may be necessary."

That on November 5, 1919, a further executive order was issued containing substantially the same language.

That on October 31, 1919, the Fuel Administrator issued rules and instructions providing:

(1) That bituminous coal should be distributed only to those consumers having no reserve supply and requiring coal to meet emergency needs.

(2) Establishing a preference grouping in 10 separate grades according to the public necessity for each.

(3) Providing that no deliveries be made to commercial customers, even in accordance with the priority list promulgated, except with specific authority from the regional coal committees.

That a system was inaugurated, controlled by the central coal committee in Washington, to pass upon the respective needs of consumers, and particularly with reference to priority, which committee functioned locally through the regional coal committees appointed throughout the country. The central coal committee had general charge of the matter in hand, which it directed through the aid of its regional committees. During the first few days in November, it was possible to issue permits for consumers in the first five classes, but on November 10 it became necessary to restrict deliveries to emergency needs of customers in those classes, and soon thereafter to provide instructions that no coal be delivered to industries for operations not immediately essential, except enough to afford necessary fire protection and to avoid serious property damage. On November 21 the Fuel Administrator issued an order prohibiting the export of anthracite coal; on November

22 he issued an order directing that coal dumped in barges, etc., on inland water ways should be subject to diversion, the same as bituminous coal loaded in cars of a common carrier, and authorizing such diversion as might be necessary according to the priority schedule set forth in the order of October 31, 1919; and on December 2, 1919, an order was issued, effective at once, that no coal should be loaded at Hampton Roads without a specific permit from the central coal committee in each instance.

The contention of the charterer is that its failure to have permits on hand at the time the respective vessels were reported for loading was not a default on its part, within the meaning of the charter, and that it is relieved from liability for demurrage, during the period the vessels were delayed before the loading began, on the ground that the delay was the direct result of a superior force beyond its control, within the meaning of the term "vis major."

[1] It will be recalled that in each of the charter parties the charterer agreed "to provide and furnish the said vessel with a full cargo of coal." By so stipulating it impliedly agreed to do every lawful act necessary to provide and furnish each vessel with a full cargo of coal, and as a government permit was necessary to enable it to fulfill its obligation, and its procurement would not be illegal, it must be taken to have agreed that it would obtain and have on hand such permit. That the parties understood that the charterer was to obtain the necessary permits appears from the facts that the charterer applied for and obtained the original permits, and also procured those on which the cargoes of coal were finally loaded.

The opinion of the District Court in P. Dougherty Co. v. 2,471 Tons of Coal, 278 Fed. 799, 802, referred to as governing its decision in this case, proceeded upon the idea that the charterer was impliedly bound only "to use due diligence to obtain the necessary permit," and that, as he apparently had done so, the charterer was not liable for the delays prior to loading. But the decision in the Dougherty Case, so far as the question now under consideration is concerned, appears to have been based upon a decision in Anglo Russian Merchant Traders, Limited, v. Batt & Co., [1917] 2 K. B. 679. That was a case where Batt & Co., by a contract made in London, August 19, 1915, sold to the Anglo Russian Company aluminum "to be shipped by steamers to Vladivostok during December-January next," the parties being residents of England and the contract made there. At the time the contract was made it was illegal to ship aluminum out of England without a permit from the government, and as it was an illegal thing to do without a permit, the court held that the seller could not be taken to have impliedly agreed to be absolutely bound to make the shipment, whether he obtained a permit or not; that the implied obligation should be held not to extend beyond an undertaking to use due diligence to procure a license to ship. We do not regard that case as applicable here, for it would not have been illegal for the charterer to "furnish and provide" a cargo, or unlawful to agree to do so or to obtain a permit.

[2] Furthermore, as the evidence shows that the charterer, at the time of making the contracts, knew or should have known that the Fuel Administrator was authorized to change the rules regarding the

delivery and loading of coal; knew or should have known that the regulations relating thereto had from time to time been changed, making the restrictions on shipments of coal more stringent; and had reason to anticipate that, as the coal shortage became greater, permits for uses such as he had requested and obtained might be cut off, we do not think the case falls within the vis major doctrine, as understood and applied in any of the cases that have been called to our attention. Crossman v. Burrill, 179 U. S. 100, 113, 21 Sup. Ct. 38, 45 L. Ed. 106; Tamplin Steamship Co. v. Anglo-Mexican, etc., Co., [1916] 2 A. C. 397; Société Anonyme, etc., v. Bull Insular Line Inc. (C. C. A.) 276 Fed. 783.

The contract, including the stipulation as to damages due to delay in loading, was special. In it the parties saw fit to provide for mutual exemption in case either was prevented from carrying out any of its undertakings through an act of God, public enemies, or dangers and risks of the sea, and, as the defendant could reasonably have foreseen that it might be delayed in loading the coal through government regulation, it should have obtained the insertion of a provision exempting it from delays thus arising. Having failed to do this, it must be held to its obligation.

The decree of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs to appellant in both courts.