STATE, USE OF LANE, ET AL. *v.* DASHIELL

[No. 190, October Term, 1949.]

678

680

*Decided July 19, 1950.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Hall Hammond, Attorney General,* and *Harrison L. Winter, Assistant Attorney General,* for the appellants.

*W. Page Dame, Jr.,* and *W. Edgar Porter,* with whom was *Amos W. W. Woodcock* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

In this suit for a declaratory decree the State of Maryland, for the use of Governor Lane, State Comptroller Lacy and State Treasurer Miles, constituting the Board of Public Works, as complainants, and J. Roland Dashiell,

a building contractor, as defendant, alleged that defendant entered into a contract in May, 1946, to build a hospital in Salisbury for complainants, but was delayed in beginning the work for ten months because of the refusal of the Civilian Production Administration of the Office of Temporary Controls to grant a permit required by its Veterans' Housing Program Order. The decree, from which the State appealed, declares (1) that it was the State's duty to obtain the permit for the construction of the building, (2) that failure to obtain the permit in time to prevent an interruption of the work constituted a breach of contract, and (3) that the Federal statutes and regulations do not excuse the State from liability.

In 1945 the Legislature of Maryland, in accordance with recommendations made by the Commission on Post-War Reconstruction and Development, authorized the Post-War Construction Loan of $4,625,000. Laws of 1945, ch. 747. At the same session the Legislature directed the Board of Public Works to formulate a program of construction and to approve certain projects for a number of State agencies and institutions. Among the specific recommendations of the Legislature was the construction by the State Department of Health of three chronic disease hospitals. Laws of 1945, ch. 1085. The Board approved the plan of the Department of Health to build a chronic disease hospital in Salisbury, to be known as the Deer's Head State Hospital, and allotted for that project the entire unexpended balance of $1,950,000 from the loan. The Board advertised for bids for construction of the building. Dashiell submitted the low bid. On May 14, 1946, the Board adopted a resolution accepting his bid on two conditions: (1) that he would agree to reduce the time for completion of the work to 18 calendar months, and (2) "that the contract would be conditioned upon the necessary clearance being obtained from the Federal authorities for proceeding with the work without delay."

The second condition was ordered in view of the Veterans' Housing Program Order, which prohibited the

684

construction of buildings except when authorized by the Civilian Production Administration. The War and Defense Contract Acts, enacted by Congress in 1940, empowered the President of the United States to establish administrative procedures for the allocation and rationing of building materials. 50 U. S. C. A. Appendix, § 1152. Under authority of those Acts, President Roosevelt in January, 1942, established the War Production Board. The Acts were amended by the Second War Powers Act of 1942. 50 U. S. C. A. Appendix, § 633. Under these Acts, President Truman, by Executive Order No. 9638, signed on October 4, 1945, and effective on November 3, 1945, 50 U. S. C. A. Appendix, § 601 note, terminated the War Production Board and transferred its functions and powers to the Civilian Production Administration. 3 C. F. R., 1945 Supp., 125. Section 4700.1 (c) of the Veterans' Housing Program Order, which was promulgated by the Civilian Production Administration on March 26, 1946, provided: "No person shall begin to construct * * * any structure, public or private, * * * except to the extent permitted under paragraphs (d), (e) and (f), or when and to the extent specifically authorized under paragraph (h)." Paragraph (d) made allowances for small jobs; paragraph (e) made exemption for repair and maintenance work in industrial utility and transportation buildings and structures; and paragraph (f) provided that the prohibitions did not apply to minimum work necessary to prevent more damage to a structure damaged by flood, fire, tornado, or similar disaster. Paragraph (h) provided that persons wishing to begin work prohibited by this section could apply for authorization. 32 C. F. R., 1946 Supp., 4725.

The contract in this case followed the Standard Form of Agreement between Contractor and Owner for the Construction of Buildings, which was issued some years ago by the American Institute of Architects. It was dated May 15, 1946, and was signed by Governor O'Conor, State Comptroller Tawes and State Treasurer Miles, then constituting the Board of Public Works, and by Dr.

Robert H. Riley, Director of the Department of Health. A copy of the resolution stipulating the two conditions of the contract was sent to the State Board of Health, and on May 29 copies of the contract were forwarded to Edwin Wilson Booth, of Salisbury, the architect employed by the State. The architect was instructed to submit the copies of the contract to Dashiell for his signature. The Board of Health notified the architect of the first proviso of the resolution, but for some unexplained reason failed to notify him of the second proviso. The architect accordingly notified Dashiell of the requirement that the work be completed within 18 months, but did not notify him that the contract would be contingent upon "the necessary clearance being obtained from the Federal authorities."

Dashiell signed the contract on May 31 and began work on the project on June 1. It was not until June 6, however, that a copy of the resolution of the Board of Public Works was furnished the architect at Salisbury. And it was not until July 15 that the Department of Health applied to the Civilian Production Administration for the permit required by the Veterans' Housing Program Order. On July 18 a Federal inspector visited the site of the hospital. Shortly afterwards the inspector notified the State officials that work on the project must be stopped because no permit had been issued. Acting upon that notice, the State officials notified the contractor to stop work on or about July 23. It was not until then that Dashiell learned of the second condition of the resolution.

Dashiell complained several times thereafter to the State officials that he was maintaining his labor force and machinery at considerable cost while expecting to resume work from day to day, and that the cost of labor and materials was constantly increasing. As it was impossible to determine how much his increased cost would amount to, it was agreed that further discussions as to additional payments that should be made by the State in excess of the contract price would be deferred until

the completion of the building, when the additional cost could be accurately determined.

The first application of the Department of Health for a Federal permit to begin construction of the hospital was denied on October 17, 1946. The Civilian Production Administration, in refusing authorization at that time, explained that it was imperative that construction be postponed to allow the Veterans' Emergency Housing Program to proceed as rapidly as possible during the critical shortage of construction materials and facilities, and that deferment of the project would help in bringing about a speedy completion of the program. It gave assurance, however, that the period of postponement would be as short as possible consistent with the critical shortage of materials. From time to time the Department of Health filed renewed applications. On January 31, 1947, the Administration granted a permit to pour concrete footings. But it was not until March 28, 1947, ten months after the formation of the contract, that the Administration granted an unqualified permit to begin construction of the building. Work was thereupon resumed on April 1.

Upon completing the building, the contractor submitted his claim for the increased cost of labor and materials resulting from the delay in obtaining the permit. A small part of his claim was for work on the foundation, which had to be done over as the result of deterioration that took place during the stoppage of work, but all the rest of the claim was for increased cost of labor and materials. The Board of Public Works requested the Attorney General for his opinion as to the validity of the claim. The Attorney General advised that the State was not liable for the increased cost of construction due to the delay and that, even if the Board recognized the claim as a moral obligation, it could not use any of the general contingent funds to make such payment. He further advised that the Legislature could not constitutionally appropriate additional funds for such purpose.

The Uniform Declaratory Judgments Act, under which this suit was brought, provides that any person interested

under a written contract may have determined any question of construction or validity arising under the contract, and obtain a declaration of rights, status or other legal relations thereunder. It declares that the word "person" shall be construed to mean any person, association, or society, or municipal corporation of any character whatsoever. Code Supp. 1947, art. 31A, secs. 2, 13. The contract in this case was made for the State by the Governor, State Comptroller and State Treasurer, constituting the Board of Public Works, and by the State Department of Health, as Joint Owners. The suit was brought by the State of Maryland for the use of the Board of Public Works. We need not consider here whether the suit could have been maintained if the Legislature had not given its sanction for the institution of this suit. In creating the General Construction Loan of 1950, the Legislature made an appropriation of an amount in the discretion of the Board of Public Works, not to exceed $250,000, to satisfy the claim for additional compensation of J. Roland Dashiell & Sons, Contractors, "to be paid only in the event of final judicial determination of legal obligation and legal ability to pay." Laws of 1950, ch. 109. This conditional appropriation is a clear implication, even if not a mandate, that there should be a judicial determination of the question of liability. Neither side has questioned the jurisdiction of the Court. Both sides prayed for an adjudication on the merits and waived as far as they could all jurisdictional defenses.

*First.* The Attorney General contended that the permit was one of a temporary nature, and hence it was not the duty of the State to apply for and obtain it. He relied on the following provision of Article 11 of the General Conditions of the Contract: "Permits and licenses of a temporary nature necessary for the prosecution of the work shall be secured and paid for by the Contractor. Permits, licenses and easements for permanent structures or permanent changes in existing facilities shall be secured and paid for by the Owner, unless otherwise specified." He contended that a permit for a

permanent structure, within the contemplation of the contract, is one that remains effective not only during the period of construction but throughout the existence of the structure. As an example he cited the permit granted by a zoning board for use of a building, such a permit being an authorization to use the building for a certain purpose as long as it stands. He contended that a permit issued by the Civilian Production Administration was merely an authorization to begin work, and did not make any regulation as to the size or appearance of the building or as to its use after its completion.

But, as the contractor argued, even though the permit needed in this case was an authorization to begin work in the nature of a grant of priority, nevertheless it was required by an authorized governmental agency for the erection of a permanent structure to cost approximately $2,000,000. We think it was a permit for a permanent structure. It is quite different from permits to block a street temporarily, to connect with a water or sewer main, and to make an attachment to an electric line, which are needed for a limited time during the period of construction of a building. There is nothing to indicate that the permits required during the Second World War by the War Production Board and later by the Civilian Production Administration were contemplated by those who drafted the Standard Form of the General Conditions of the Contract for the American Institute of Architects.

In *Staunton and King v. Wellington Education Board*, 28 N. Z. L. R. 449, 455, upon which the Attorney General relied, the Supreme Court of New Zealand ruled that where a builder enters into a contract to erect a building, in the absence of any stipulation in the contract, it is his duty to apply for and obtain all permits necessary under the by-laws of any local authority before the work can be started. But in that case, which was decided in 1909, the evidence showed that it was "the invariable custom" in New Zealand at that time for the builder to apply for all permits. In the case before us there is no

evidence of any invariable custom with reference to applications for permits from the Federal Government.

*Second.* The Attorney General contended that, even though it was intended by the parties that the State would apply for and obtain the Federal permit, the State was excused from that duty by impossibility of performance. It is a general rule of the common law that when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused. This rule was founded on the theory that if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control. The unjust consequences of this general rule gave rise to certain exceptions. One of these is that a contractual duty is discharged where performance is subsequently prevented or prohibited by a judicial, executive, or administrative order, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty. *Wischhusen v. American Medicinal Spirits Co.*, 163 Md. 565, 572, 163 A. 685; *Fast Bearing Co. v. Precision Development Co.*, 185 Md. 288, 44 A. 2d 735; 2 Restatement, Contracts, sec. 458. But an order which interferes with the performance of the contract is not an excuse if the circumstances surrounding the formation of the contract are such as to indicate that the possibility of such interference was recognized and the risk of it was assumed by the promisor.

Thus, in those cases where a regulation of an administrative agency is already in force at the time of the formation of the contract, the decisive question is whether or not the promisor assumed the risk of interference by the regulation. For example, in *Anglo-Russian Merchants Traders v. John Batt & Co.*, [1917] 2 K. B. 679, where a contract was made in London in 1915 to sell 50 tons of aluminum to be shipped by steamers to Vladivostok, but at the time the contract was made it was unlawful to ship aluminum from England without a

permit from the British Government, the Court decided that it could not be implied that the sellers undertook an absolute obligation to make shipment whether they obtained a permit or not, and therefore, having used reasonable diligence to obtain a permit, they were not liable for damages. On the contrary, in *Inter-Coast Steamship Co. v. Seaboard Transportation Co.*, 1 Cir., 291 F. 13, where two vessels were chartered to carry cargoes of coal, and the charterer had knowledge that a permit to load coal would be necessary, and that the regulations for obtaining a permit were subject to modification by the Fuel Administrator and were becoming more stringent, the Court held that the charterer could not avoid liability for demurrage during the time when the permit was withheld, since he had failed to insert a clause in the charter to exclude delay for inability to procure the permit.

In the instant case the Board of Public Works had knowledge that it was necessary to obtain a permit, and they knew or ought to have known that there was a possibility that there might be a delay in obtaining the permit. The Board of Public Works and the Department of Health, entering into the contract as joint owners, recognized and assumed the risk of getting the permit. We, therefore, hold that the State was not excused from its duty.

*Third.* The Attorney General contended that the State is excused from liability for breach of contract by the provision of the Second War Powers Act, under which the Veterans' Housing Program Order was issued, that no person shall be held liable for damages or penalties for any default under any contract which shall result directly or indirectly from compliance with any order issued by the Civilian Production Administration. 50 U. S. C. A. Appendix, § 633 (a) (7).

It was questioned by the contractor whether the word "person," within the contemplation of this provision of the Act, includes the State. Section 644b declares that the word "person" shall include any individual,

partnership, association, or any organized group of persons, whether incorporated or not. The contractor urged that Section 633(a) (7) is not applicable to a State, because Section 633(a) (5) makes it a misdemeanor for any person to willfully perform any act prohibited by any order of the Civilian Production Administration, and that this penal provision obviously does not apply to a State. But the contract in this case was made by the members of the Board of Public Works and by Dr. Riley, as Director of the Department of Health, and we see no reason why Section 633(a) (7) would not apply to public officials.

However, in view of the acts of the officials in this particular case after the first application for a permit was refused, the State cannot rely upon Section 633(a) (7) to escape liability for damages for breach of contract. In *Stamey v. State Highway Commission of Kansas*, D. C., 76 F. Supp. 946, 949, the Court held that a stop order of the War Production Board directing contractors engaged in highway construction to stop work was valid, and that the contractors were thereby discharged from performance. We likewise hold that the stop order given in July, 1946, by the Civilian Production Administration, the successor of the War Production Board, was valid, and that in view of that stop order, the parties might have undertaken to cancel the contract. But the Board did not see fit to cancel it. The Board decided to keep the contractor waiting day by day for ten months while the Department of Health was making repeated applications for the permit. In the meantime the contractor was sustaining heavy losses. Several times he complained to the State officials that he was holding his machinery and his force of employees at considerable expense, and that the cost of labor and materials was constantly increasing. Nevertheless, the officials decided to postpone consideration of his claim until the completion of the project. In any event, Section 633(a) (7) did not restrict the power of either State officials or private individuals to make contracts, but

only protected parties to existing contracts made prior to the passage of the Act.

It is, of course, true that the State has immunity from suit. But when the State enters into a contract with constitutional authority, it acquires rights and incurs responsibilities like those of any individuals who are parties to such a contract. The fact that the State, like the United States, may not be sued without its consent is a matter of procedure which does not affect the validity of its contracts. Although the Legislature, like the Congress, is not bound to provide remedies through the courts, yet a contractual obligation is binding upon the conscience of the sovereign. *United States v. Bank of the Metropolis*, 15 Pet. 377, 10 L. Ed. 774; *Cooke v. United States*, 91 U. S. 389, 23 L. Ed. 237; *Perry v. United States*, 294 U. S. 330, 55 S. Ct. 432, 79 L. Ed. 912, 95 A. L. R. 1335. In *Union Pacific R. Co. v. United States*, 99 U. S. 700, 25 L. Ed. 496, 501, Chief Justice Waite declared: "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that terms implies, as it would be if the repudiator had been a State or a municipality or a citizen." Justice Brandeis emphasized the same doctrine in his opinion in *Lynch v. United States*, 292 U. S. 571, 54 S. Ct. 840, 844, 78 L. Ed. 1434, as follows: "Punctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors. * * * To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation."

Article 3, Section 35, of the Constitution of Maryland provides: "No extra compensation shall be granted, or allowed, by the General Assembly, to any Public Officer, Agent, Servant, or Contractor, after the service shall have been rendered, or the contract entered into; * * *." This provision was first written in the Constitution of 1851. It next appeared in the Constitution of 1864. It is now included in the Constitution of 1867. In 1914

it was implemented by statute. The statute provides that an officer or agent of the State who is charged or entrusted with the construction of any building or work of any kind shall not make any contract binding or purporting to bind the State to pay any sum of money not previously appropriated for the purpose for which such contract is made. Any officer who makes or participates in making a contract without such appropriation or authority shall be personally liable thereon, and the State shall not be liable thereon. The statute makes it a crime for any officer to willfully or knowingly create a deficiency, incur a liability, or expend a greater sum than is appropriated by the Legislature for any public institution or department of this State. Laws of 1914, ch. 451, Code 1939, art. 31, sec. 2.

It is thus the public policy of the State of Maryland to save the members of the Legislature from importunities of State contractors by restricting them to the exact compensation fixed by their contracts. By this salutary restraint, no amount of greed or misfortune and no artifice or pretense can avail to increase the amount payable under a contract with the State. We agree that this restraint imposed by the Constitution upon the agencies of government should be interpreted, not narrowly like the provisions of a penal statute, but broadly to promote the policy behind it. However, neither the Constitution nor the statute applies to this case. The contractor is making his claim under Article 31 of the General Conditions of the Contract, which provides: "If either party to this Contract should suffer damage in any manner because of any wrongful act or neglect of the other party or of anyone employed by him, then he shall be reimbursed by the other party for such damage." We are convinced that the term "extra compensation" does not embrace damages for breach of contract. As we have already said, the Legislature appropriated a sum not to exceed $250,000 to be used for payment of Dashiell's claim, conditioned upon judicial determination of legal obligation and legal ability to pay. The statute

prohibits any public official from making any contract binding the State to pay money not previously appropriated. It does not, however, prohibit the Legislature from appropriating money to pay damages to a contractor for breach of contract on the part of the State.

*McGovern v. City of New York,* 234 N. Y. 377, 138 N. E. 26, 31, 25 A. L. R. 1442, 1448, makes a clear distinction between extra compensation and damages. The plaintiffs in that case made a contract with the city of New York in August, 1916, for the construction of a section of a subway. When war was declared, great numbers of workmen entered the military service and others obtained employment in munition plants and other industries engaged in the manufacture of war supplies. The United States Government paid a scale of wages greatly in excess of that prevailing in subway and similar work when war was declared. So also did the war industries. At first the contractors refused to pay the increase in wages demanded, unless the city would agree to reimburse them for the added cost resulting from payment of the increased scale. But the city refused to enter into any binding agreement. Thereupon the plaintiffs canceled the new scale, and the men struck. They gave notice in striking that, unless they had a satisfactory agreement, they would scatter and thus prevent any further prosecution of subway work. The city, acting through the Public Service Commission and the Board of Estimate, promised to pay the extra cost of labor and materials for the performance of the contract made necessary by the outbreak of war and the threat of laborers to strike unless paid more wages. The Court of Appeals of New York held that the promise of the public officials was invalid under the provision of the Constitution of the State of New York that the Common Council shall not grant any extra compensation to any public contractor. Judge Cardozo, in delivering the opinion of the Court, distinguished between the claim for extra compensation and a separate claim for damages as follows: "Some point is made that the contractors

had claims against the defendant for delays already suffered as a result of the defendant's acts, and that there was a promise to pay these claims if the contractors would yield to the strikers and go forward with the work. The act did not supply a consideration for the promise. The delays charged against the city occurred while the undertaking was still new. The contractors with notice of the breach had elected to perform. Long before the promise of extra compensation, the right to rescind, if it ever existed, had been definitely renounced. What was left was a claim for the damages incurred. * * * Whatever damages have been suffered as a result of the defendant's fault, the plaintiffs may still recover."

For these reasons we consider that the State is liable for any damages which the contractor suffered as the result of the breach of contract by the State. The declaratory decree entered by the Court below will therefore be affirmed.

*Decree affirmed.*