EQUITABLE TRUST COMPANY ET AL. *v.* THE TOWSON MANOR ASSOCIATION, INC. ET AL., ETC.

[No. 702, September Term, 1974.]

*Decided July 3, 1975.*

The cause was argued before MOYLAN, MENCHINE and MOORE, JJ.

*W. Lee Harrison,* with whom were *Weinberg & Green* on the brief, for appellants.

*Gordon G. Power* and *Russell D. Karpook* for appellees.

MENCHINE, J., delivered the opinion of the Court.

The Towson Manor Association, Inc. and the Wiltondale Improvement Association, Inc., incorporated community associations serving two residential communities adjoining

the subject tract of land, and the individual owners [1] of certain residential properties within those communities (hereafter collectively called "Towson") filed a bill for injunction seeking to restrain transfer of title to certain property unless alleged binding restrictions upon use of that land were incorporated in the deed. The bill of complaint was directed against Equitable Trust Company, Equitable Bancorporation and Maryland Title Guarantee Company (hereafter collectively called "Equitable"). The joint answer of the defendants denied that valid restrictions had been impressed upon the land.

The tract in question, long known as The Towson Nursery, consists of approximately five acres of land lying on the east side of York Road in Towson, Maryland, bounded on the south by Terrace Dale, on the north by Hillside Avenue and on the east by Cedar Avenue. A somewhat extended recitation of the zoning history of the tract is necessary to an understanding of the circumstances giving rise to the litigation between Towson and Equitable.

In 1970 the subject tract was classified DR-16 (16 density unit per acre). In that classification, construction of an office building was permissible only by special exception. A petition was filed seeking a special exception [2] for an elevator office building with a right to use a temporary, removable structure on the land pending its completion. Towson opposed the petition. The petition was denied by the Zoning Commissioner. Equitable appealed to the County Board of Appeals for Baltimore County. That appeal having become moot by reason of the passage of a county wide comprehensive rezoning ordinance, it was, on motion, formally dismissed on August 24, 1972.

In early 1971 the Baltimore County Council was engaged in giving consideration to that comprehensive rezoning

---

1. Robert J. Laird and Lillian Laird, his wife; Burton E. Greenwood and Dorothy Greenwood, his wife; Claude W. Todd, Jr. and Margaret Todd, his wife; Carl E. Bruff and Mary Carol Bruff, his wife; Joe Carroll Bradley and Nelle B. Bradley, his wife, and Thomas F. Mullen and Anita C. Mullen, his wife.

2. An earlier special exception for office building use, authorized in 1965 under the zoning code would expire on December 5, 1970.

ordinance. Equitable had requested the County Council to grant a BL (business local) classification. Under BL classification, use of the property for an elevator office building would have been permissible without special exception. Towson opposed the request. The Planning Commission recommended continuance of the DR-16 classification.

Webster C. Dove was a member of the Baltimore County Council for the district that included the subject land.[3] As the result of actions taken by Mr. Dove, the ultimate zoning classification to be assigned to the subject property had been left open, to be fixed on the date of the final passage vote of the Council, scheduled for March 24, 1971.

Such was the status of the subject property on March 10, 1971 when F. E. Chippendale, a Vice President of Equitable Trust Company, addressed a letter to the officers and members of Towson Manor Association proposing resolution of "the zoning problems associated with the parcel of land * * *." The letter offered to bind Equitable to numerous restrictions upon use of the property by deed.[4]

Upon receipt of the Chippendale letter of March 10, 1971, a general meeting of Towson Manor Association was called and held, with a resolution passed that the course suggested by Chippendale was acceptable if the proposal would be "strengthened" by clarifying language. Thomas F. Mullen, a member of a committee of Towson Manor Association, thereafter notified Equitable of Towson Manor Association's counter-proposal. Mullen carried the letter of March 10, 1971 back to Chippendale with the clarifying language noted on the original of that letter. This occurred on the morning of March 11, 1971. Chippendale at that time verbally agreed to incorporate the clarifying language in a

---

3. For a discussion of the procedural course followed by the County Council in connection with the ultimate comprehensive rezoning ordinance, see: Nottingham Village v. Baltimore County, 266 Md. 339, 349-53, 292 A. 2d 680, 685-87.

4. There had been numerous prior conferences and meetings between representatives of Towson and Equitable in attempts by all parties to achieve agreement respecting a zoning classification to be applied to the subject tract that would be mutually satisfactory.

later letter (subsequently accomplished in the letter of March 17, 1971, *infra*). With such verbal assurance, Mullen telephoned Councilman Dove, advising him that Towson Manor Association now supported Equitable's request for BL zoning. Chippendale for Equitable [5] then on March 17, 1971 addressed to the officers and members of the Towson Manor Association the following letter:

"The purpose of this letter is to set forth the things that The Equitable Trust Company, *including any wholly-owned subsidiary or any alternate designee-purchaser, of The Equitable Trust Company,* is willing to do *and covenant in deed accordingly,* in order to resolve the zoning problems associated with the parcel of land containing approximately five (5) acres at the southeast corner of York Road and Hillside Avenue together with the proposed improvements to be placed thereon.

"It is our understanding that because of various constraints contained in the proposed revisions to the zoning regulations, as they apply to the proposed zoning of the subject property, the most compatible zoning for the purposes involved seems to be Business Local (BL). However, the residents living in the neighborhood are gravely concerned by the fact that the zoning permits many retail and commercial uses which they feel are very objectionable in the interest of maintaining a desirable residential community. You have, therefore, asked us if we are willing to impose certain restrictions and requirements to be observed in the development of the land in the event the land is zoned BL, said restrictions and requirements to be recorded and run with the land for a twenty-year period after which they will be null and void. It must be understood, of course, that

---

5. It was stipulated that the letter was within the scope of Chippendale's authority.

in the event the County, State or Federal Government should have requirements that would conflict with any of the following items, then the County, State or Federal requirements would take precedence.

"We must also stipulate that The Equitable Trust Company is not prepared to start construction of the proposed office building immediately, and may delay doing so for some time in view of the tremendous amount of office space that will soon be available in the various buildings now under construction in the Towson area. However, in order to retain the existing State and Federal approvals to operate a branch bank at this location (and to comply with the banking regulations as to ownership of this property), The Equitable Trust Company must promptly erect a suitable building to house a branch bank and open same for business. It is our intent to install a demountable type building similar to that used by the Maryland National Bank on Painters Mill Road at Music Fair Road in Owings Mills.

"The proposed deed restrictions are as follows (subject to the interim use set forth above):

"(1) This parcel to be improved only with an office building together with parking facilities for the use of the occupants and visitors in the office building. Said building not to exceed eight floors plus a ground floor, or a total of nine floors in all. Said building to be so situated and designed so as to provide for ingress and egress from and to Terrace Dale Road (as proposed to be widened) and from and to Hillside Avenue (as proposed to be widened) as illustrated on the 'Plat to Accompany Petition for Special Exception With Yard & Height Variances and a Parking Permit in a Residential Zone, Vicinity York Road and Hillside Avenue,' dated November 30, 1970, and prepared by Matz, Childs & Associates, and on the preliminary plans

entitled 'Proposed Office Building 7800 York Road, Towson, Maryland, for Equitable Trust Company,' prepared by Bonnett and Brandt, Architects and Engineers, dated 12/10/69 and 2/16/70, and further identified as Drawing No. P-1, P-2 and P-3.

"(2) The building is to be occupied by business offices which shall be construed to include such activities as an insurance agency, stockbrokers' offices, etc. All retail businesses (other than banking facilities and services conducive to the convenience of the tenants in the building, such as a cafeteria, duplicating and mimeographing, *for the exclusive use of the tenants and their invitees*) shall be excluded. Specifically, it is the express intent of this agreement to exclude all of the uses enumerated in Section 230 [6] of the present zoning regulations except those relating to parking and the uses mentioned above.

"(3) Signs shall be limited to the following:

"(a) One sign indicating the presence and location of the banking facility. To be on the west wall of the building, visible only from York Road. If illuminated, it is to be the non-flashing type.

"(b) One sign indicating the name of the building. In this connection it should be noted that it is quite possible the building may be named after the principal tenant as an inducement to become a tenant in the building. To be located on the west wall of the building, visible only from York Road. If illuminated, it is to be of the non-flashing type.

"(c) One sign indicating the street address of the building, i.e., 7800 York Road.

"(d) Service signs giving directions to the bank's drive-in facilities and building delivery facilities. If lighted, to be non-flashing and to be

---

[6.] More than fifty uses under BL zoning are authorized by the general provisions of Section 230.

lighted only during those periods when bank and/or building delivery facilities are open for use.

"(e) Entrance, exit and traffic direction signs as needed to direct and control the movement of motor vehicles into and out of the driveways and parking areas.

"(4) Lighting: The parking area and driveways are to be properly lighted to promote the safety and convenience of tenants, employees and invitees of the building. However, only low level shielded lights (not exceeding 12 feet in height) shall be used, and shall be shielded so as not to shine into neighboring houses.

"(5) Screening: At the time the office building is built, (a) a six-foot high stockade type wooden fence shall be installed along the eastern boundary of the property where it abuts the residential properties facing on Cedar Avenue. Existing trees within three feet of this boundary line shall not be removed. (b) Dense hedging and trees shall be planted along the boundaries formed by Hillside and Cedar Avenues.

"It is our further understanding that if you find the contents of this letter acceptable, you will promptly notify the appropriate County officials that you support our request for BL zoning, [provided this letter is] *and the foregoing will be* complied with by The Equitable Trust Company *accordingly.*"

(Except for the deletion of the words shown in brackets and the addition of the words shown in italics, the Chippendale letters of March 10 and March 17 were identical.) [7]

On March 22, 1971, J. C. Bradley, President of The Towson

---

7. Testimony by the witness Mullen, uncontradicted in the record, was to the effect that those changes reflected the conditional acceptance by Towson's membership at its general meeting following receipt of the letter of March 10, 1971.

428

Manor Association addressed a letter to the Baltimore County Council reading as follows:

> "Enclosed is a copy of a letter sent to The Towson Manor Association. The letter contains a list of restrictions and limitations to be imposed on the improvement of the lot located on the southeast corner of York Road and Hillside Avenue in Towson by the Equitable Trust Company. Further, it has been stated by Equitable Trust pending their purchase of the lot that they are willing to record these restrictions in a covenant to the deed for a period of twenty (20) years.
>
> "Under these conditions The Towson Manor Association is willing to support The Equitable Trust Company's request for Business Local (BL) zoning for the said tract of land."

Bradley testified that he had hand delivered that letter to the wife of Councilman Webster Dove at their home, receiving her assurance that it would be given to the Councilman. Councilman Dove acknowledged that he had received the letter. On March 24, 1971 the County Council of Baltimore County applied a BL classification to the subject tract.

The trial court granted the injunction as prayed. On appeal, Equitable contends:

1. That Towson Manor Association did not accept Equitable's offer.
2. That there was a failure of consideration for Equitable's promise to Towson Manor Association and, alternatively,
3. That under the doctrine of "commercial frustration" Equitable is entitled to release from its commitment because performance became impossible "as a result of action of the Federal Reserve Board."

We find merit in none of these contentions.

## Offer and Acceptance

The trial judge found that there was an offer and acceptance. The evidence previously delineated herein fully supports that finding. The contention that there was no acceptance is without merit.

## Consideration

Equitable suggests that forbearance to assert a groundless claim is not a good consideration for the promise, citing *Strohecker v. Schumacher & Seiler, Inc.*, 185 Md. 144, 43 A. 2d 208, and *Fiege v. Boehm*, 210 Md. 352, 123 A. 2d 316. Although Equitable's suggestion overstates the rule of the cited cases, it is plain that the forbearance of Towson Manor Association in the subject case was not such as would fall within the proscription of those cases. This becomes instantly apparent from the statement of the Court in *Fiege, supra*, at 361 [322]:

> "On the other hand, forbearance to sue for a lawful claim or demand is sufficient consideration for a promise to pay for the forbearance if the party forbearing had an honest intention to prosecute litigation which is not frivolous, vexatious, or unlawful, and which he believed to be well founded."

In the subject case we find it unnecessary to say more than that the zoning history of the subject property, in the light of continuing opposition by the Planning Staff, demonstrates that the BL classification *may not* have been applied to the subject tract had not Towson's opposition to it been withdrawn. There was a valid consideration for Equitable's promise.

## Commercial Frustration

Equitable suggests that it is entitled to relief from its undertaking because, "* * * under Article 11, § 71, of the Annotated Code of Maryland (1957 Edition), a bank may only hold real estate under certain circumstances

430

enumerated therein. As a result of the decision of the Federal Reserve Board on or about December 4, 1972, appellant Equitable can no longer meet the requirements set forth in Article 11, § 71, for holding real estate and must therefore dispose of its interest in the subject property."

Although supporting evidence for the contention in the subject record is sparse indeed, we shall assume that the factual premise suggested by Equitable has been shown. We hold that under the controlling Maryland decisions, Equitable is not aided by such factual assumption.

In the leading case of *State, Use of Lane v. Dashiell*, 195 Md. 677, 75 A. 2d 348, it was said at 689 [353-54]:

"* * * It is a general rule of the common law that when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused. This rule was founded on the theory that if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control. The unjust consequences of this general rule gave rise to certain exceptions. One of these is that a contractual duty is discharged where performance is subsequently prevented or prohibited by a judicial, executive, or administrative order, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty. Wischhusen v. American Medicinal Spirits Co., 163 Md. 565, 572, 163 A. 685; Fast Bearing Co. v. Precision Development Co., 185 Md. 288, 44 A. 2d 735; 2 Restatement, Contracts, sec. 458. But an order which interferes with the performance of the contract is not an excuse if the circumstances surrounding the formation of the contract are such as to indicate that the possibility of such interference was recognized and the risk of it was assumed by the promisor.

"Thus, in those cases where a regulation of an

administrative agency is already in force at the time of the formation of the contract, the decisive question is whether or not the promisor assumed the risk of interference by the regulation."

See also *Acme Moving and Storage Corp. v. Bower*, 269 Md. 478, 483, *et seq.*, 306 A. 2d 545, 548.

In *Montauk Corporation v. Seeds*, 215 Md. 491, 138 A. 2d 907, it was said at 499-500 [911]:

"The general principle underlying commercial frustration is that where the purpose of a contract is completely frustrated and rendered impossible of performance by a supervening event or circumstance, the contract will be discharged. The courts in determining whether frustration will apply usually look to three factors. The first and probably most important is whether the intervening act was *reasonably foreseeable* so that the parties could and should have protected themselves by the terms of their contract. The courts then must consider the questions of whether the act was an exercise of sovereign power or *vis major*, and whether the parties were instrumental in bringing about the intervening event. The courts have generally held that if the supervening event was reasonably foreseeable the parties may not set up the defense of frustration as an excuse for nonperformance. The majority of the courts stress this principle in deciding cases on frustration, and hold that if the parties could have reasonably anticipated the event, they are obliged to make provisions in their contract protecting themselves against it. 18 University of Cincinnati L.Rev. 536; Cf. State, to Use of Lane v. Dashiell, 195 Md. 677, 689, 75 A. 2d 348."

In *Acme Markets, Inc. v. Dawson Enterprises, Inc.*, 253 Md. 76, 251 A. 2d 839, the Court of Appeals at 91 [848] adopted the language of the case of *Perry v. Champlain Oil Co.*, 101 N. H. 97, 98, 134 A. 2d 65, 67 (1957):

> " 'Generally speaking, the courts have been careful not to find commercial frustration if it would only result in allowing a party to withdraw from a poor bargain.' "

It is plain that Equitable made an unconditional promise. The assumed fact that Equitable was prevented by an order of the Federal Reserve Board *to proceed in accordance with its plan* for the use of the subject property, does not qualify as an exception to the application of the general rule binding it to that unconditional promise. This is so because: (1) there is not a scintilla of evidence that the subject tract may not be fully and profitably utilized within the restrictions agreed to by Equitable; [8] (2) none of the restrictions are violative of County, State or Federal requirements; (3) the possibility that Federal approval for Equitable Trust Company itself to operate a branch bank at the location might be withdrawn could have been foreseen at the time of the unconditional promise and contract provisions guarding against such a contingency could have been made; and (4) return to the *status quo* at the time of the agreement is impossible—Towson necessarily would sustain an irretrievable loss—Equitable would acquire benefits it had forsworn.

## Additional Contention

Chippendale for Equitable, subsequent to passage of the comprehensive rezoning ordinance, had directed a letter to the President of Wiltondale Improvement Association (Wiltondale), declaring, *inter alia*, "We have previously agreed with the Towson Manor Association, and we are willing to include you in said agreement, in consideration of your not entering an appeal against the BL zoning, to the effect that we are willing to impose certain restrictions and requirements to be observed in the development of the land in the event the BL zoning is not appealed (or if appealed by others the BL zoning is maintained by the courts) said

---

8. It has not even been shown that Equitable made a "poor bargain." Acme Markets, Inc. v. Dawson Enterprises, Inc., *supra.*

restrictions and requirements to be recorded and run with the land for a twenty-year period after which they would be null and void." That letter recited the same deed restrictions as did the letter of March 17, 1971, *supra.*

As to Wiltondale, Equitable makes all of the previously discussed contentions that we have held to be without merit. Equitable additionally contends as to Wiltondale that its promise was without consideration, because:

(1) the BL classification on the property was a *fait accompli* when its letter to Wiltondale was written; or

(2) the comprehensive rezoning ordinance was not susceptible to appeal and thus there was neither benefit to the promisor nor detriment to the promisee.

Even if the additional contention as to Wiltondale were meritorious, the injunction against Equitable by the chancellor was properly granted as to Towson Manor for the reasons heretofore stated. We find, however, that the additional contention also is without merit. While it is true that the letter to Wiltondale was written subsequent to the passage of the rezoning ordinance, this fact did not mean that the ordinance was immune to attack upon classifications applied by it upon individual properties. *Ford v. Baltimore County,* 268 Md. 172, 300 A. 2d 204. It is true that the form of the action required to test the validity of that ordinance as applied to a particular property would not be an "appeal" in the generally accepted sense. Nonetheless, there was an avenue of attack upon the zoning available to Wiltondale to pursue. The Equitable letter to Wiltondale manifestly was intended to dissuade the latter from such an attack. The record shows that Wiltondale was thereby dissuaded. Equitable's unconditional promise to Wiltondale was supported by a valid consideration unaffected by commercial frustration.

*Judgment affirmed.*
*Appellants to pay costs.*