704 A.2d 421

**HARFORD COUNTY, Maryland**

v.

**TOWN OF BEL AIR.**

**No. 114, Sept. Term, 1995.**

Court of Appeals of Maryland.

Jan. 14, 1998.

Jefferson L. Blomquist (Ernest A. Crofoot, Harford County Department of Law, on brief), Bel Air, for Petitioner.

Charles B. Keenan, Jr. (Kimberley Kahoe Muenter, Stark and Keenan, P.A., on brief), Bel Air, for Respondent.

Argued before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI*, BELL and RAKER, JJ.

---

* Murphy, C.J., and Karwacki, J., now retired, participated in the hearing of this case while active members of this Court; after being recalled

ELDRIDGE, Judge.

We issued a writ of certiorari in this case primarily to address Harford County's argument that, under the doctrine of governmental immunity, "the County could abrogate its obligations under a contract entered into in performance of a governmental function if dictated by the public good." (Harford County's brief at 17). We shall reject this argument, along with several other contentions advanced by Harford County in an effort to justify the County's breach of a contract with the Town of Bel Air.

I.

In 1954, Harford County and the Town of Bel Air entered into an agreement whereby the Town leased approximately 27 acres of land from the County for 25 years, at $1 per year. The Town used a portion of the 27 acres as a sanitary landfill (presently known as "Tollgate Landfill"), and the County reserved the right to use the remainder of the acreage.[1]

On February 24, 1969, the County and the Town executed a new contract which replaced the 1954 contract. In exchange for the Town's agreement to terminate the 1954 contract, the County agreed:

"1. To provide, for a term of ninety-nine (99) years, adequate facilities or transfer stations, for the disposal of all refuse originating in the Town of Bel Air, including garbage, household trash, minor home appliances, stumps, brush and leaves [and] demolition rubble at no 'on-site expense' to the [Town]; . . .

"2. To provide for a term of ninety-nine (99) years adequate facilities for disposal of major home appliances,

pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and the adoption of the opinion.

1. In 1954, the Town did not have land suitable for the landfilling of municipal waste.

and other like bulky non-burnable articles at no 'on-site expense' to [the Town]."

The Town also agreed to the following provisions:

"1. It shall not be the responsibility of the [County] to provide equipment to haul or transport such refuse originating in the Town of Bel Air to such refuse disposal facilities or transfer station.

"2. The [Town] will not use the said facilities or transfer station for any other purposes than those listed above without obtaining prior approval from the [County] in writing."

In 1981 Harford County enacted Bill No. 81–24, which imposed a $10 per ton fee on solid waste haulers for "any solid waste, collected in Harford County for deposit in any solid waste facility or landfill operated by or under contract for Harford County located within Harford County." In light of Bill No. 81–24, the County attempted to charge the Town $10 per ton of refuse that the Town deposited into county facilities or landfills. In response, the Town filed an action for a declaratory judgment in the Circuit Court for Harford County, asserting that the 1969 agreement exempted it from the fee.

On March 17, 1982, the circuit court rendered a declaratory judgment which concluded that "the Lease Agreement dated February 24, 1969, is a valid agreement" and "[t]hat the Town of Bel Air is exempt from the charges imposed by Bill 81–24...." The court based its conclusion on the following four determinations: (1) "solid waste disposal operations are ... a proprietary function" and, therefore, Harford County had no governmental immunity from suit; (2) the County and the Town were authorized to execute the 1969 agreement; (3) the phrase "on-site expense" in the 1969 agreement, exempting the Town from such expenses, encompassed the $10 per ton fee; and (4) "the County is not able ... to cancel the contract ... on the basis of unreasonableness."

The County appealed the trial court's decision to the Court of Special Appeals. Prior to briefing and argument in that

court, both the County and the Town petitioned this Court for a writ of certiorari, which we denied. Thereafter, the County filed a motion in the Court of Special Appeals to dismiss its appeal, and the intermediate appellate court dismissed the appeal.

In 1988, the General Assembly enacted the Maryland Recycling Act, which imposed a mandatory requirement on the County to recycle 20% of its solid waste by January 1, 1994. The Recycling Act also required that the County adopt a plan to accomplish this objective. *See* Ch. 536 of the Acts of 1988; Maryland Code (1982, 1996 Repl.Vol.), § 9–505(a)(18) of the Environment Article.

In 1992, in accordance with the Maryland Recycling Act, the County administrators submitted a recycling plan to the County Council for its approval. Accompanying this plan was Bill No. 92–10, which imposed a $35 per ton "tipping fee" [2] on solid waste haulers depositing waste at either the County municipal sanitary landfill or at the Harford Resource Recovery Facility (HRRF).[3] The County adopted the plan and enacted Bill No. 92–10 in February 1992. Shortly thereafter, the County again attempted to charge the Town for the municipal waste and recyclables that the Town deposited either at the county municipal sanitary landfill or at the HRRF.[4]

---

**2.** The fee is labeled as a "tipping fee" because it is measured by the difference between the gross weight upon entrance and the gross weight upon exit of the vehicles that transport solid waste to the landfill or the recycling facility. Thus, the fee is based on the amount that a particular vehicle "tips" the scale.

**3.** In the mid–1980s, the County built and began to operate the Harford Resource Recovery Facility (HRRF), which reduced the volume of waste required to be placed in the landfill by reprocessing and recycling certain municipal wastes. Since 1988, all of the Town's recyclable wastes, except for bulky wastes, have been processed at the HRRF.

**4.** Bill No. 92–10, as currently set forth in § 109–7.1J(1) of the Harford County Code, provides, in pertinent part, as follows:

"(1) Each hauler, other than an individual citizen of the county depositing his own residentially-generated solid waste, shall pay a fee for all solid waste deposited or disposed of in any resource-recovery facility or county-owned or operated landfill at a rate of thirty-five

The Town brought another declaratory judgment action against the County in the Circuit Court for Harford County, seeking a declaration that the fee was an illegal tax and that imposition of the fee violated the 1969 agreement.[5] The County filed a counterclaim for accrued fees, and both parties filed motions for partial summary judgment on the issue of the fee's legality. After some procedural skirmishes, the circuit court in substance denied the motions for partial summary judgment and set the case for trial in May 1995.

At the conclusion of the trial, the circuit court issued a declaratory judgment, declaring that the 1969 agreement was valid and that the Town was exempt from the fee imposed by Bill No. 92–10. The court reasoned that it was bound by the 1982 declaratory judgment under principles of res judicata, stating:

"[O]n the res judicata issue that does bind us in certain findings that Judge Fader made back in 1982. He did find that this was a valid contract supported by adequate consideration; . . .

"He also found that the solid waste issue was a proprietary as opposed to a governmental function. And as I read the *Eslinger* case, that is something that I am bound by, even if I would have come to a different decision had I approached it as a fresh issue.

"And in all probability, quite frankly, I think under the facts presented in this case I think that's more likely than

---

($35.00) dollars per ton. All monies collected from the fee shall be dedicated to the operating and/or capital expenses associated with solid waste disposal management. This fee shall not apply to any recyclable or compostable material accepted by the county for deposit."

**5.** The Town claimed that the sole purpose of the fee was to raise revenues to establish an enterprise fund intended to finance the entire waste management function of the County. Such a purpose, argued the Town, illegally exceeds the taxing authority granted to the County under Maryland Code (1957, 1996 Repl.Vol., 1997 Supp.), Art. 25A. The Town further argued that the validity of the 1969 agreement could not be challenged by the County under principles of res judicata.

not the answer. Although I am not making a finding in that regard, I think more likely than not under today's law it probably would be determined to be a governmental issue. But we are bound by Judge Fader's decision on that issue, as I previously mentioned.

"We are also bound by his decision as to what an on-site expense is, insofar as the '82 tipping fee is concerned. Of course as to the present fee he didn't make a finding because it wasn't in effect. But I do find that the two statutes establishing the respective fees are similar except that the present tipping fee exempts recycling. So I really think they are so similar almost to be distinction without a difference."

The court rejected the County's argument that it was entitled to rescind the agreement on the ground that the contract was unenforceable under the doctrines of frustration of purpose and legal impossibility. The court also rejected the County's argument that the agreement was *ultra vires* and against public policy. The County's claim for accrued fees was denied.

The County filed a notice of appeal. Prior to briefing and argument in the Court of Special Appeals, the Town filed in this Court a petition for a writ of certiorari which we granted.

The County's primary argument before this Court is that it is entitled to governmental immunity under this Court's decisions in *American Structures v. City of Balto.*, 278 Md. 356, 364 A.2d 55 (1976); *Lake Roland Elevated Railway Co. v. Mayor & c. of Balto.*, 77 Md. 352, 26 A. 510 (1893); and *Rittenhouse v. Baltimore*, 25 Md. 336 (1866). The County specifically argues that, pursuant to those cases, it is entitled to "abrogate its obligations under a contract entered into in performance of a governmental function if dictated by the public good." (County's brief at 17). According to the County, the collection and disposal of municipal waste "constitutes a governmental, not a proprietary, function." (*Id.* at 24). While recognizing that in 1976 the General Assembly abolished any

entitlement to governmental immunity in contract actions which might otherwise be possessed by a charter county,[6] Harford County maintains that, under the above cited cases, the County is entitled to immunity with regard to contracts entered into prior to 1976. The County further argues that, as the 1982 case involved a "totally different transaction" from the present one, in that the two "fees were enacted at different times and for entirely different motives," principles of res judicata do not bar the relitigation of its governmental immunity.

The County further argues that, even if it is not entitled to governmental immunity with regard to the Town's declaratory judgment action, the 1969 Agreement, under general principles of contract law, (1) lacked consideration, (2) is unenforceable due to inadequacy of consideration, (3) is unreasonable, (4) is a nullity under the doctrines of frustration of purpose and impossibility of performance, (5) contravenes the statutory public policies mandating recycling and solid waste management.

According to the Town, however, the circuit court correctly relied on the 1982 declaratory judgment that the County was not immune from this action. The Town contends that the activity involved is "proprietary" rather than "governmental." The Town further argues that the County cannot escape its contractual obligations under any of the above-mentioned contract theories. In the Town's view, the 1969 agreement exempts it from the $35 fee. Alternatively, the Town asserts that the "decree of March 17, 1982, declaring the Town County agreement to be valid is conclusive as a matter of res judicata." (Town's brief at 24).

Since we shall reject the County's arguments on their merits, we need not, and shall not, reach the parties' contentions based on principles of res judicata.

---

**6.** *See* Maryland Code (1957, 1996 Repl.Vol., 1997 Supp.), Art. 25A, § 1A(a).

## II.

This Court has consistently taken the position that "Maryland law has never recognized the defense of governmental immunity in contract actions against counties and municipalities" and that "counties and municipalities are normally bound by their contracts to the same extent as private entities." *Montgomery County v. Revere*, 341 Md. 366, 384, 671 A.2d 1, 10 (1996). "[M]unicipalities and counties have been regularly subject to suit in contract actions, whether the contracts were made in the performance of a governmental or proprietary function, as long as the execution of the contract was within the power of the governmental unit." *American Structures v. City of Balto.*, *supra*, 278 Md. at 359–360, 364 A.2d at 57, and cases there cited. *See also, e.g., Fraternal Order of Police v. Baltimore County*, 340 Md. 157, 173, 665 A.2d 1029, 1037 (1995) ("Baltimore County was bound by the contract which it had made with the Union"); *Board v. Town of Riverdale*, 320 Md. 384, 389, 578 A.2d 207, 210 (1990) ("counties and municipalities have never been granted immunity in contract actions"); *Md.–Nat'l Cap. P. & P. Comm'n v. Kranz*, 308 Md. 618, 622, 521 A.2d 729, 731 (1987) ("counties and municipalities do not possess [the State's] general immunity. Instead, counties and municipalities have never been given immunity in contract actions").

The scope of governmental immunity for counties and municipalities was recently summarized by this Court in *Board v. Town of Riverdale*, *supra*, 320 Md. at 389–390, 578 A.2d at 210:

"State agencies have normally been treated as if they were the State of Maryland for purposes of immunity, so that they enjoy the same immunity from ordinary tort and contract suits which the State enjoys.

\* \* \*

"Counties and municipalities, on the other hand, have not been accorded this broad general immunity from suit. *Md.–Nat'l Cap. P. & P. Comm'n v. Kranz, supra*, 308 Md. at 622, 521 A.2d at 731. It is true that they are

instrumentalities of the State, created by the State to carry out some of the State's governmental functions. Nevertheless, under Maryland law, they have consistently been treated differently from State agencies and the State itself for purposes of immunity from suit. Thus, counties and municipalities have never been granted immunity in contract actions. *Md.–Nat'l Cap. P. & P. Comm'n v. Kranz, supra,* 308 Md. at 622, 521 A.2d at 731; *American Structures v. City of Balto.,* 278 Md. 356, 359–360, 364 A.2d 55 (1976). Their immunity 'is limited to tortious conduct,' *Austin v. City of Baltimore, supra,* 286 Md. at 53, 405 A.2d at 256. And, as to tort actions, the immunity is limited. As previously noted, it is inapplicable to nuisance actions. *Tadjer v. Montgomery County, supra,* 300 Md. at 550, 479 A.2d at 1326. It is also inapplicable to actions based on violations of constitutional rights. *Clea v. City of Baltimore,* 312 Md. 662, 667–668 n. 3, 541 A.2d 1303 (1988), and cases there cited.

"With regard to ordinary tort actions, counties and municipalities can rely on the defense of governmental immunity only when they exercise a function categorized as 'governmental' rather than 'proprietary' or 'corporate.'"

Under the above-summarized principles, therefore, Harford County has no governmental immunity in contract actions or in declaratory judgment actions relating to contractual rights and liabilities. The governmental-proprietary distinction, relied on by the court below and debated by the parties, has no application in contract actions. The distinction is pertinent only in certain types of tort actions against counties or municipalities.

Nevertheless, Harford County asserts that three of this Court's decisions authorize a county to abrogate or breach a contract as long as the contract involves the performance of a "governmental function" and the abrogation or breach is in accordance with "the public good." The three cases relied upon are *American Structures v. City of Balto., supra,* 278 Md. 356, 364 A.2d 55; *Lake Roland Elevated Railway Co. v. Mayor & c. of Balto., supra,* 77 Md. 352, 26 A. 510; and

*Rittenhouse v. Baltimore, supra,* 25 Md. 336. The decisions in these cases do not support Harford County's position.

*American Structures v. City of Balto., supra,* 278 Md. 356, 364 A.2d 55, involved a contract between Baltimore City and American Structures under which American Structures was to construct a storm drain outfall in accordance with specifications furnished by the Maryland State Highway Administration. During the construction, a dispute arose over a requested adjustment of the contract price because American Structures encountered conditions allegedly different from those contemplated by the contract. American Structures, claiming that the City had breached the contract, filed a declaratory judgment action against, *inter alia,* Baltimore City. The City moved to dismiss on the ground of governmental immunity. The trial court, in granting the motion to dismiss, filed an opinion in which the court held that the City's "purpose [was] to further the public benefit and general welfare" and that the construction activity constituted "a governmental function." [7] This Court, while not disagreeing with the trial court's holdings concerning public benefit and governmental function, reversed the dismissal of the action against the City. We held that the City was not entitled to governmental immunity in a contract action, regardless of whether the contract was made in the performance of a governmental or a proprietary function.

The holding in *American Structures* clearly refutes Harford County's argument that counties and municipalities are entitled to abrogate or breach their contracts as long as the activity involved is "governmental" and the governmental decision is consistent with the "public good." Nonetheless, there is language in the *American Structures* opinion, describing the holdings in *Lake Roland Elevated Railway Co. v. Mayor & c. of Balto., supra,* 77 Md. 352, 26 A. 510, and *Rittenhouse v. Baltimore, supra,* 25 Md. 336, which, if taken out of context, might seem to support Harford County's argument in the

---

7. *See* Briefs and Records in No. 14, September Term 1976, Joint Record Extract at E. 4.

present case. The Court in *American Structures* commented as follows (278 Md. at 359–360, 364 A.2d at 57):

"*Lake Roland Elevated Ry. v. Baltimore,* 77 Md. 352, 370–372, 381, 26 A. 510, 512–513, 516 (1893) and *Rittenhouse v. Baltimore,* 25 Md. 336, 346–48 (1866), are authority for the proposition that while a municipality may abrogate its responsibility under a contact entered into in performance of a governmental function if dictated by the public good, the municipality is answerable in damages incurred to the time of cancellation. As a consequence, municipalities and counties have been regularly subject to suit in contract actions, whether the contracts were made in performance of a governmental or proprietary function, as long as the execution of the contract was within the power of the governmental unit...."

Harford County argues that the first sentence of the above-quoted passage supports its contention that local governments have governmental immunity in contract actions if the activity involved is "governmental" and if the local government's breach of the contract is in the "public good." If the first sentence of the quoted passage means what Harford County contends, it would appear to be inconsistent with the sentence which immediately follows it.

The Court in the first sentence of the above-quoted passage, however, was not recognizing a degree of local "governmental immunity" in contract actions. Instead, the two sentences together flatly reject any notion that a local government has immunity from suit in a contract action. The Court in the sentence quoted above was doing no more than attempting to characterize the *Lake Roland Elevated Railway* and *Rittenhouse* cases, and to point out that, even when a municipality is entitled to abrogate a contract, it has no governmental immunity which would bar a suit for damages. An examination of the *Lake Roland Elevated Railway* and *Rittenhouse* cases demonstrates that the reference to a municipality's entitlement to abrogate a contract, and limit its damages, did not concern governmental immunity from suit. Rather, it related to a special situation where an earlier statute specifically

granted or authorized the grant of alleged contractual rights to a person or entity, where a later statute repealed the earlier statute, and where the validity of the later statute was challenged on the ground that it impaired the obligation of contracts in violation of Art. I, § 10, cl. 1, of the United States Constitution.

*Rittenhouse v. Baltimore* concerned an ordinance enacted by the City Council of Baltimore in 1860 which expressly authorized the City to purchase the site for and erect an almshouse. Pursuant to the ordinance, the City in 1860 entered into a contract with George R. Rittenhouse under which Rittenhouse agreed to perform all of the brick-mason's work for the almshouse, including supplying the bricks and the materials for mortar. In 1861, the City Council enacted another ordinance which expressly repealed the 1860 ordinance, and Rittenhouse was notified of the repealing ordinance in a letter from the Mayor. Thereafter, Rittenhouse brought a breach of contract action against the City, contending that the City should not have stopped him "in the execution of his contract with the defendant ... after the passing of the said repealing ordinance." 25 Md. at 341–342. From a trial court judgment in favor of the City, Rittenhouse appealed to this Court. He argued that the repealing ordinance was unconstitutional, stating (25 Md. at 343):

> "To affirm that a municipal corporation may, under a pretext of a change in its policy, annul the obligation of its contracts made with individuals, is to arrogate for such corporation a more absolute sovereignty than is possessed by the State, to whom it owes its existence. By the Constitution of the United States, Article I, section 10, no State shall pass any law impairing the obligation of contracts, and by fair implication no State can be permitted to confer on an inferior organization a power which is denied to itself."

Baltimore City countered that the 1861 repealing ordinance was constitutional, saying that the City (*id.* at 344–345)

"possessed jurisdiction and power, in its public or municipal character, to pass the repealing Ordinance, and have validly exercised that power. The contract must be understood as having been entered into with full knowledge of, and subject to the power of the appellee to repeal its Ordinance of 1860, and to abandon the site, and with it the work, if in its judgment the public good demanded it."

This Court's opinion in *Rittenhouse* held that the 1861 repealing ordinance was valid, pointing out that the legislative body of the City had determined that the public good required that the construction of the almshouse be discontinued, that generally "a municipal corporation cannot, by contract, abridge its legislative power" (*id.* at 347), and that the City "acted in its public legislative capacity, in which its powers could not be abridged by any previous covenant into which it had entered" (*id.* at 348). Because the 1861 ordinance was held to be valid, the Court stated that Rittenhouse was "not entitled to claim any damages on account of profits he might have realized under the contract if he had been permitted to go on with the work" (*ibid.*). Nevertheless, this Court reversed the judgment in favor of the City, holding that Rittenhouse was entitled to recover damages actually sustained. Moreover, the Court criticized a jury instruction which limited Rittenhouse to damages sustained prior to the repealing ordinance, saying (*id.* at 349–350):

"[T]here is one expression in the court's instruction that might mislead the jury in regard to this item of claim;—the appellant was limited to recover 'any damage which he had actually sustained by reason of the contract, and *before the enactment of the repealing Ordinance.*' With regard to the damage resulting from the loss in the sale of the bricks, it might be said that it had not been actually sustained till they were sold, which was after the repealing Ordinance had been passed, and thus, under the instruction, the jury may have considered it as excluded. Considering that this damage, if found by the jury, was one actually suffered under the contract while it was in force, although the amount of it was not ascertained till afterwards, and ought to be allowed,

and believing the jury may have been misled by the language of the court, we think there ought to be a new trial. . . ."

*Lake Roland Elevated Railway Co. v. Mayor & c. of Balto.* also involved the issue of whether a repealing statute was valid under the Contract Clause of the United States Constitution. Baltimore City Ordinance No. 23, enacted in April 1891, specifically authorized Lake Roland Elevated Railway Co.'s predecessor to lay down tracks on specified Baltimore City streets, including double tracks on Lexington Street. Thereafter, the Railway Company began to lay double tracks on Lexington Street over the objection of the Mayor. Apparently, streetcars on double tracks would not leave enough room for the passage of other vehicles in some locations. Ordinance No. 1, approved in November 1892, "repealed that portion of Ordinance No. 23 which authorized the double tracks on Lexington Street, but permitted the laying of single track on certain conditions." 77 Md. at 365, 26 A. at 511. Baltimore City then began to remove the double tracks pursuant to the repealing ordinance. The Railway Company filed a bill of complaint in the Circuit Court of Baltimore City (an equity court) for an injunction to restrain the City authorities from removing the double tracks. The ground for the injunction was that the repealing ordinance was invalid. The Circuit Court, holding that the repealing ordinance was valid, dismissed the bill of complaint.

The Railway Company appealed, arguing that Ordinance No. 23 of 1891 created a valid contract between the Railway Company and the City, that the Railway Company had been granted vested contract rights by the 1891 ordinance, and that the ordinance of 1892, purporting to repeal those rights previously granted, was invalid. The Railway Company relied on cases taking the position that enactments were invalid if they impaired the obligation of contracts, including, *e.g., New Orleans Gas–Light Co. v. Louisiana Light Co.,* 115 U.S. 650, 6 S.Ct. 252, 29 L.Ed. 516 (1885); *Penn. Railroad Co. v. Balt. & Ohio Railroad Co.,* 60 Md. 263 (1883); and *M'Mechen v. The Mayor, & c.,* 2 H. & J. 41, 46 (1806) ("The repealing ordinance

cannot destroy or affect any right which was acquired by any person under the first ordinance before the repeal thereof"). The City countered that "Ordinance No. 23, approved April 8th, 1891, was not an irrepealable contract ... creating a vested right in the company," 77 Md. at 357, 26 A. 510, that "it only conferred on the company an authority, privilege or license to use said street," *ibid.*, and that such authority, privilege or license "may be absolutely repealed at the will of the Legislature." *Id.* at 359, 26 A. 510.

This Court in *Lake Roland Elevated Railway Co.* affirmed. After pointing out that "[t]he question now presented to the Court is whether the City Council had power to pass the [repealing] ordinance of November ... 1892," 77 Md. at 366, 26 A. at 511, the Court went on to hold that the repealing ordinance did not impair the obligation of contract and, therefore, was valid. This result was based on the Court's conclusion that the initial 1891 ordinance "did not vest in the Lake Roland Company an irrevocable right in the streets," 77 Md. at 383, 26 A. at 516, and that the " 'Legislature did not intend to divest itself, and could not divest itself, of its control over the streets for the public welfare,' " 77 Md. at 380, 26 A. at 515. In reaching this conclusion, the Court pointed to the general principles that a legislative body "cannot abridge its own legislative powers," 77 Md. at 366, 26 A. at 511, and cannot " 'pass an irrevocable ordinance,' " 77 Md. at 370, 26 A. at 512. The Court emphasized that the members of the legislative body were acting in "the exercise of powers entrusted to them in their municipal character[ ] exclusively for public purposes," 77 Md. at 371, 26 A. at 513. The Court distinguished cases invalidating enactments under the Contract Clause, such as *New Orleans Gas–Light Co. v. Louisiana Light Co., supra,* 115 U.S. 650, 6 S.Ct. 252, 29 L.Ed. 516, and *Trustees of Dartmouth College v. Woodward,* 4 Wheat. 518, 4 L.Ed. 629 (1819). Furthermore, the Court's opinion specifically relied upon numerous cases rejecting Contract Clause challenges to similar legislative enactments, including, *e.g., Stone v. Mississippi,* 101 U.S. 814, 25 L.Ed. 1079 (1880); *Newton v. Commissioners,* 100 U.S. 548, 25 L.Ed. 710 (1880);

*Boston Beer Co. v. Massachusetts,* 97 U.S. 25, 24 L.Ed. 989 (1878); and *Rittenhouse v. Baltimore, supra,* 25 Md. 336. The *Lake Roland Elevated Railway Co.* opinion concluded by observing that, "[a]lthough the city had a right to repeal this ordinance, it would have been obliged to make compensation to the railroad company if the expense of laying tracks on Lexington Street had been reasonably incurred in reliance on Ordinance No. 23." 77 Md. at 381, 26 A. at 516.

The *Rittenhouse* and *Lake Roland Elevated Railway Co.* cases, therefore, decided the constitutionality, under the Contract Clause of the United States Constitution, of subsequent statutes repealing earlier statutes, where the earlier statutes were alleged to grant or authorize vested contract rights. The holdings in both cases were that the subsequent repealing statutes did not violate the Contract Clause because the earlier statutes did not grant or authorize such vested contract rights that would be protected by the Contract Clause. The references to governmental purposes and "public good" in both opinions were integral parts of the holding that the subsequent repealing statutes were valid under the Contract Clause. Such references did not constitute any recognition of local governmental immunity from suit in contract actions. To the contrary, the decision in *Rittenhouse* and the language in *Lake Roland Elevated Railway Co.* make it clear that local governments in Maryland enjoy no immunity from suits for damages in contract actions. Apart from this, the *Rittenhouse* and *Lake Roland Elevated Railway Co.* cases have no relevance to the present case. The case at bar does not involve any challenge to a Harford County ordinance on Contract Clause or other constitutional grounds. This is simply a breach of contract case.

Harford County's interpretation of this Court's opinions in *American Structures, Lake Roland Elevated Railway Co.,* and *Rittenhouse* is erroneous, and its reliance on those cases is misplaced.[8] Harford County has no governmental immunity

---

8. The same erroneous interpretation of *American Structures, Lake Roland Elevated Railway Co.,* and *Rittenhouse* appears to be reflected in

from suit in contact actions.[9]

## III.

As earlier mentioned, Harford County raises several other issues in its effort to avoid its obligations under the 1969 contract with the Town of Bel Air. We shall now address these arguments.

## A.

 The County initially maintains that the 1969 agreement lacks any consideration and is, therefore, unenforceable. It is true that contracts ordinarily require consideration to be enforceable. *Beall v. Beall*, 291 Md. 224, 229, 434 A.2d 1015,

---

language in some opinions by the Court of Special Appeals. *See, e.g., Francis O. Day Co., Inc. v. Montgomery County*, 102 Md.App. 514, 517–518, 650 A.2d 303, 305–306 (1994); *Leese v. Baltimore County*, 64 Md.App. 442, 477–478, 497 A.2d 159, 177–178, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985). To the extent that such language or opinions are inconsistent with this opinion, they are disapproved.

**9.** It should be noted that there may be other reasons for rejecting Harford County's claim of governmental immunity in this case. For example, it is not at all clear that Maryland law recognizes any defense of governmental immunity in actions between Maryland municipalities and Maryland counties. The cases in this Court recognizing local governmental immunity in tort actions against counties and municipalities, growing out of activities classified as "governmental," have involved claims by individuals or non-governmental entities. *See* the cases collected in *Austin v. City of Baltimore*, 286 Md. 51, 55–60, 405 A.2d 255 (majority opinion), 77–78 (concurring and dissenting opinion), 45 A.2d 255, 257–260 (majority opinion), 269 (concurring and dissenting opinion) (1979).

This Court in *Board v. Town of Riverdale*, 320 Md. 384, 390–391, 578 A.2d 207, 210–211 (1990), held that neither a county nor a municipality could interpose the defense of governmental immunity in a tort suit brought by a county board of education, regardless of whether the underlying activity is categorized as governmental or proprietary. Under Maryland law, a county board of education is a state agency and not an agency of the county government. This Court has never decided whether the governmental immunity defense may be relied on in a tort action by a municipality against a county, or in a tort action by a county against a municipality. Since the present action is not in tort, we need not and do not decide the question now. It remains an open issue under Maryland law.

1018 (1981); *Broaddus v. First Nat. Bank,* 161 Md. 116, 121, 155 A. 309, 311 (1931). Here, it is evident on the face of the 1969 agreement that there is consideration supporting it. Thus, the 1969 agreement was executed primarily in exchange for the termination of the 1954 contract, under which the Town had 10 years remaining on its 27 year lease of the Tollgate Landfill. This Court has recognized that "a compromise of the differences between the parties, and the mutual agreement to rescind the old contract and to enter into a new contract embodying the compromise, are sufficient consideration to support the new contract." *Hercules Powder Company v. Harry T. Campbell Sons Co.,* 156 Md. 346, 362, 144 A. 510, 516 (1929).

Furthermore, the 1969 agreement imposed upon the Town the responsibility for transporting all "refuse originating in the Town of Bel Air to [the] refuse disposal facilities or transfer station" and "not us[ing] the said facilities or transfer station for any other purposes than those listed above without obtaining prior approval from the [County] in writing." The residents of the Town of Bel Air are also residents of Harford County, and a Maryland county has responsibilities with respect to the collection and environmentally safe disposal of solid waste on behalf of all residents of the county.[10] By the contract with the Town, Harford County fulfilled part of its responsibilities concerning the collection and disposal of solid waste. Under our decisions, the undertakings in the 1969 agreement amount to "a benefit to the promisor or a detriment to the promisee" sufficient to constitute "valuable consideration." *Vogelhut v. Kandel,* 308 Md. 183, 191, 517 A.2d 1092, 1096 (1986). *See, e.g., Shimp v. Shimp,* 287 Md. 372, 385, 412 A.2d 1228, 1234 (1980); *Snider Bros., Inc. v. Heft,* 271 Md. 409, 415, 317 A.2d 848, 852 (1974); *Devecmon v. Shaw,* 69 Md. 199, 201–202, 14 A. 464, 465 (1888); *Williston on Con-*

---

10. *See, e.g.,* Code (1982, 1996 Repl.Vol.), §§ 9–222, 9–503, 9–1703 through 9–1705 of the Environment Article. Pertinent statutory provisions in effect in 1969 when the agreement was entered include, *e.g.,* Code (1957, 1966 Repl.Vol.), Art. 25, §§ 3(v), 14A; Code (1957, 1965 Repl.Vol.), Art. 43, §§ 388–395, 402.

*tracts* (4th ed.), § 7.4. *See also Powder Company v. Campbell, supra,* 156 Md. at 365, 144 A. at 517, citing *Williston's Wald's Pollock on Contracts* at 203, 204 (3rd ed.) ("the undertaking or doing of anything beyond what one is already bound to do, though of the same kind and in the same transaction, is a good consideration").[11]

## B.

The County also argues that the 1969 agreement is unenforceable because of the "gross inadequacy" of consideration. Specifically, the County maintains that the only consideration given for the 1969 agreement was "the return of the unused portion of an uncompleted gift [*i.e.* the remainder of the lease under the 1954 agreement] from the County." (Harford County's brief at 44–45). According to the County, "[t]he deal is so lopsided in favor of the Town that the inequity needed to void it is almost self-apparent...." (*Id.* at 45).

▮▮▮ As discussed in Part A above, the Town's agreement to rescind the 1954 agreement was not the only consideration supporting the 1969 agreement. Even if it were, however, absent fraud, "it is well settled that the Courts of Law ... will not inquire into the adequacy of the value exacted for the promise so long as it has some value." *Blumenthal v. Heron,* 261 Md. 234, 242, 274 A.2d 636, 640 (1971). *See Vogelhut v. Kandel, supra,* 308 Md. at 190, 517 A.2d at 1096; *Banner v. Elm,* 251 Md. 694, 697–698, 248 A.2d 452, 453–454 (1968); *Straus v. Madden,* 219 Md. 535, 542, 150 A.2d 230, 235 (1959); *Hays v. Hollis,* 8 Gill 357, 369 (1849). *See also Stewart v. The State,* 2 H. & G. 114, 119 (1828) ("Inadequacy of consideration alone, untinctured by fraud or circumvention, is not a sufficient ground to vacate a contract otherwise regular"). The circuit court below similarly rejected the County's argument, reasoning that

---

11. There is also authority for the proposition that the County's act of performing under the 1969 agreement for nearly 13 years estops it from claiming that the agreement lacks consideration. *See Williston on Contracts* (4th ed.), § 7.15.

"what the town has given up in comparison to what it is receiving in return is not equal.... But the law does allow and enforce lopsided contracts. Generally the law does not require that the consideration be equal or that there be parity, only that the consideration be adequate."

We agree. While it may be that the County's full expectations under the agreement have not been met, "[n]o party has a right to rescind or modify a contract merely because he finds, in the light of changed conditions, that he has made a bad deal." *McKeever v. Washington Heights Realty Corp.*, 183 Md. 216, 220, 37 A.2d 305, 308 (1944). *See Straus v. Madden, supra,* 219 Md. at 542, 150 A.2d at 235; *Vincent v. Palmer,* 179 Md. 365, 372, 19 A.2d 183, 188 (1941). For the same reason, we reject the County's assertion that it can breach the 1969 agreement because the terms of the agreement are "unreasonable" in light of the increase in the County's solid waste disposal costs since 1969.

## C.

In the County's view, the 1969 agreement should be declared a "nullity" under the doctrines of frustration of purpose and impossibility of performance.

■ The principle underlying the frustration of purpose doctrine "is that where the purpose of a contract is completely frustrated and rendered impossible of performance by a supervening event or circumstance, the contract will be discharged." *Montauk Corp. v. Seeds,* 215 Md. 491, 499, 138 A.2d 907, 911 (1958). The *Montauk* opinion outlined the following three factors for courts to examine when determining whether the frustration doctrine applies: (1) whether the intervening act was reasonably foreseeable; (2) whether the act was an exercise of sovereign power; and (3) whether the parties were instrumental in bringing about the intervening event. *Ibid. See also Acme Markets v. Dawson Enterprises,* 253 Md. 76, 90–91, 251 A.2d 839, 847–848 (1969).

■ Under the doctrine of legal impossibility, "[i]f a contract is legal when made, and no fault on the part of the

promisor exists, the promisor has no liability for failing to perform the promised act, after the law itself subsequently forbids or prevents the performance of the promise." *Wischhusen v. American Medicinal Spirits Co.*, 163 Md. 565, 572–573, 163 A. 685, 687–688 (1933). In order to succeed under this theory, however, performance under the contract must be objectively impossible. *Levine v. Rendler*, 272 Md. 1, 7–12, 320 A.2d 258, 262–265 (1974); *Acme Markets v. Dawson Enterprises, supra*, 253 Md. at 89–90, 251 A.2d at 847; *State v. Dashiell*, 195 Md. 677, 689–690, 75 A.2d 348, 353–354 (1950); *Damazo v. Neal*, 32 Md.App. 536, 541–543, 363 A.2d 252, 255–257 (1976); *Equitable Trust v. Towson Manor*, 27 Md.App. 420, 429–432, 340 A.2d 759, 765–766 (1975).

Under the facts of this case, the County cannot escape its contractual obligations under either of these doctrines.

■ According to the County, because the 1969 agreement contemplates the "disposal" of *all* refuse, whereas current state regulations require that some of this refuse be "recycled," performance under the agreement is legally impossible or, at the very least, frustrated. The County's argument depends on defining the term "disposal" so that it does not include "recycling." The County, however, adopts an overly restrictive view of the term "disposal." Rather, we agree with the circuit court's conclusion in this case that

"recycling and disposal really are in the same category. Solid waste disposal certainly means doing something or getting rid of what you have, and that doesn't necessarily mean getting rid of it for all time. But I would find that recycling is a method of disposal of solid waste."

Moreover, when the 1969 agreement was entered into, there was no relevant statutory definition of the term "disposal," or of any phrase containing the term. Accordingly, it is reasonable that, under the 1969 agreement, the term "disposal" was given its common dictionary meaning by the parties. BLACK'S LAW DICTIONARY at 557 (4th ed.) defines "disposal" as the "[s]ale, pledge, giving away, use, consumption or any other disposition of a thing." Thus, it is most likely that the term

"disposal" under the 1969 agreement simply meant the transfer of refuse from the Town to a County facility, whether it was a sanitary landfill or a recycling facility.

When the Maryland Legislature created a definition for "solid waste disposal system" in 1971, it did so broadly, consistent with the parties' use of the term "disposal" under the 1969 agreement. For example, under Maryland Code (1957, 1980 Repl.Vol.), Art. 43, § 387C(a)(15), "solid waste disposal system" included "all solid waste acceptance facilities used in connection with the system." Moreover, a "solid waste acceptance facility" included "any sanitary landfill, incinerator, transfer station or any other type plant the primary purpose of which is for the disposal, treatment or processing of solid waste." Code, Art. 43, § 387C(a)(16).

Since "disposal" encompasses "recycling," it is evident that the change in state and federal environmental regulations concerning recycling neither frustrates, nor makes legally impossible, compliance with the 1969 agreement. Moreover, the court below, after hearing testimony and examining evidence, found that the change in state and federal environmental regulations were foreseeable and, therefore, did not meet the first requirement under the frustration of purpose doctrine outlined by the Court in *Montauk Corp. v. Seeds, supra.* The circuit court stated as follows:

"[I]n 1969, when this contract was signed, the state of solid waste management and/or disposal was indeed in a state of flux. I ... infer that at the time everyone knew that great changes would be taking place in the future concerning solid waste."

Furthermore, the recycling regulations do not prevent the County from exempting the Town from the $35 tipping fee. The regulations simply may make it more expensive for the County to continue to do so. Arguments similar to those made by the County were rejected by this Court in *Levine v. Rendler, supra,* 272 Md. 1, 320 A.2d 258. There, owners of several lots in a residential subdivision brought an action against the developer for failing to comply with the develop-

er's earlier representation that the roads would be paved in compliance with county specifications. When the representation was made, the county only required the roads to be paved with a surface treatment. After the developer's promises, but before the roads had been paved, the county adopted a more comprehensive road ordinance which required the surface to be paved with two inches of concrete. Adherence to the new specifications would require significantly more work at a much greater expense to the developer. The developer argued that the change in county specifications (1) rendered its agreement to pave the roads legally impossible, and (2) increased the cost under the agreement such that performance of the obligation was different from what was contemplated under the agreement. This Court disagreed, reasoning as follows (272 Md. at 11–12, 320 A.2d at 264):

"In this case we have no prohibition against construction of a road by the [developer] ... nor do we have an utter impossibility of compliance brought about by conflicting governmental authority.... We have a change in the county specifications. The possibility of that change should have been perceived by the [developer] back in 1965.... Obviously, the cost of upkeep of the roads, once they were accepted by the county, would be much higher if the ... surface treatment were used. Therefore, there was every reason to expect that the county might move to a requirement that would cost it less money over the years to maintain the roads in the condition in which they were received.

"The contention of the [developer], that the change in the law, with a higher cost of performance, makes the obligation substantially different from that originally contemplated by them, likewise must fall. They agreed to put in a road to county specifications. As it was put in *407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.*, 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37 (1968):

'[T]he applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were

the rules otherwise, they would place in jeopardy all commercial contracts.' *Id.* at 282, 296 N.Y.S.2d 338, 244 N.E.2d 37."

In rejecting a similar claim of legal impossibility, the Court in *Acme Markets v. Dawson Enterprises, supra*, 253 Md. at 89, 251 A.2d at 847, explained that "[i]t may be inconvenient; it may be profitless; it may and very likely would be expensive; but it is not impossible." The case at bar clearly does not present the type of situation in which either the frustration of purpose doctrine or the impossibility of performance doctrine applies.

### D.

■ Finally, the County contends that the 1969 agreement frustrates its attempt to fulfill its state-mandated recycling plan and to ensure the reduction and reprocessing of municipal waste. For this reason, the County asserts that "public policy requires the voidance of the 1969 Agreement."

There is no conflict between the Town's exemption from the 1992 tipping fee and the County's ability to meet the state mandated recycling plan or to ensure the reduction and recycling of municipal waste. While the policies underlying the Maryland Recycling Act may generally support the imposition of a tipping fee to encourage the recycling of municipal wastes, the state statute does not prohibit the County from exempting a particular municipality from that fee. The County may certainly meet the State's mandatory recycling requirement without charging the Town the $35 per ton fee. Indeed, the record reveals that the County has already met these requirements.

The circuit court correctly rejected the County's arguments based on principles of contract law.

*JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY MODIFIED IN ACCORDANCE WITH PART II OF THIS OPINION, AND, AS SO MODIFIED, AFFIRMED. HARFORD COUNTY TO PAY COSTS.*