*Baltimore Cotton Duck, LLC v. Ins. Comm'r of the State of Md.*, et al., No. 951, September Term, 2022. Opinion by Nazarian, J.

**INSURANCE – FINANCIAL IMPAIRMENT – SUPERVISORS, LIQUIDATORS, CONSERVATORS, REHABILITATORS OR RECEIVERS – POWERS AND DUTIES**

Once an Insurance Commissioner is appointed receiver, the Commissioner may, either directly or through an agent, disavow or amend existing contracts for impaired insurers in order to protect insureds, creditors, and the general public. There is an important state interest in protecting health insurance policyholders, creditors, and the general public, and the procedures and powers the Insurance Code affords the Commissioner do not violate the U.S. or Maryland Constitutions.

Circuit Court for Baltimore City
Case No. 24-C-17-003939

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 951

September Term, 2022

_____

BALTIMORE COTTON DUCK, LLC

v.

INSURANCE COMMISSIONER OF THE
STATE OF MARYLAND, *ET AL.*

_____

Nazarian,
Leahy,
Raker, Irma S.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: October 25, 2023

*Arthur, Kevin F., and Albright, Anne K., JJ.,
did not participate in the Court's decision to
designate this opinion for publication pursuant to
Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

This appeal arises out of delinquency proceedings in the Circuit Court for Baltimore City brought by the Maryland Insurance Administration ("MIA") against Evergreen Health, Inc. ("Evergreen"), a licensed health maintenance organization ("HMO"). The dispute involves a commercial lease for office space between Evergreen, as tenant, and Baltimore Cotton Duck, LLC ("BCD"), as landlord and creditor. The State of Maryland, acting as a Receiver through an agent, Risk & Regulatory Consulting, LLC ("RRC"), and standing in the shoes of Evergreen, agreed with BCD to amend the lease as part of the plan to liquidate Evergreen, which was insolvent.

RRC sought to recover the security deposit Evergreen had paid and collect other money BCD owed Evergreen under that lease amendment. BCD disputed the amounts owed, arguing that it entered into the lease amendment under economic duress, that the notice of the delinquency proceeding and claims process violated its right to due process, and that RRC was granted authority by the circuit court to disavow the original lease improperly. The circuit court disagreed and ordered BCD to repay the Evergreen's security deposit and to pay $8,000 for furniture Evergreen left on the premises. BCD appeals and, among other things, claims that the entire enforcement scheme, including the Department's authority to disavow the lease, is unconstitutional. We affirm.

## I.    BACKGROUND

Anyone who engages in or transacts health insurance business in Maryland is subject to provisions of the Insurance Article and the Health-General Article of the Maryland Code. Evergreen was licensed as an HMO incorporated under the laws of Maryland on September 6, 2011, and was subject to the regulation of the MIA, *see* Md.

Code (1995, 2017 Repl. Vol.), § 2-101 of the Insurance Article ("IN"); Md. Code (1982, 2019 Repl. Vol.), § 19-702(b) of the Health-General Article ("HG"), and Title 9 of the Insurance Article, which regulates insurance entities operating in a "financially hazardous" condition. *See* Md. Code (1996, 2017 Repl. Vol.), IN §§ 9-101 *et seq.* The Insurance Commissioner operates the MIA and enforces the Insurance Article. IN § 2-103(b)(1).

### A. The Original Lease And First Amendment.

In February 2013, Evergreen entered a ten-year commercial lease for office space owned by BCD located on Falls Road in Baltimore. Evergreen agreed to occupy the waterfront "Mill Building" of the premises and to pay monthly rent that would increase annually. Section 1.03 of the lease gave Evergreen a limited right to terminate the lease subject to an early termination fee. Section 2.07 provided that Evergreen would pay a $16,770.20 security deposit "for the Tenant's payment of Rent and performance of all of its other obligations under the provisions of this lease." BCD was liable to pay all costs for space improvements "for the purpose of initially preparing the Premises for occupancy by [Evergreen] . . . ." And section 16.01 provided that "[a]ny notice, demand or other communication to be provided hereunder to a party hereto shall be . . . addressed to Terra Nova Ventures, LLC, 1817 Thames Street, Baltimore, Maryland 21231, if directed to [BCD]." Rent—according to the lease—was to be paid to the same address, but no one disputes that rent in fact was paid to a North Charles Street address belonging to BCD's property manager.

A short time later, in July 2013, the lease was amended (the "First Amendment") to expand the rental space so that Evergreen would occupy both the Mill Building and the

"Warehouse Building" behind it. This expansion nearly doubled Evergreen's monthly rent to approximately $40,000 per month, and Evergreen paid an additional security deposit to BCD (the total security deposit was $37,294.10). Again, as part of the agreement, BCD built out the space that Evergreen occupied at BCD's own cost.

## B. Evergreen's Receivership.

It wasn't long before Evergreen experienced financial difficulties that triggered oversight by the MIA and the Insurance Commissioner. Section 19-706.1(c) of the Health-General Article authorizes the Commissioner to apply to the Circuit Court for Baltimore City for an order directing the Commissioner to rehabilitate or liquidate an HMO "[w]hen in the Commissioner's opinion the continued operation of the [HMO] would be hazardous either to its members or to the people of this State."[1]

On July 31, 2017, the Commissioner applied to the circuit court for an order appointing RRC as receiver for Evergreen.[2] The court granted the request the same day in an Order of Rehabilitation by Consent (the "Rehabilitation Order") between Evergreen and the Commissioner. Notices were sent to creditors under the terms of the order, including to BCD, which received a copy of the order the day after it was issued.

It became clear pretty quickly that there was no hope of rehabilitating Evergreen, and RRC sought the circuit court's authorization to liquidate it. On September 1, 2017, the

---

[1] This statutory scheme is based on the Uniform Insurer's Liquidation Act and is the exclusive method of liquidating an insurer. *See PrimeHealth Corp. v. Ins. Comm'r*, 133 Md. App. 375, 400 (2000); IN § 9-204.

[2] RRC is a consulting company that administers the rehabilitation and liquidation of insurance companies across the country.

court entered an Order Authorizing Liquidation of Evergreen Health, Inc., and Order Directing Certain Health Maintenance Organizations to Offer Evergreen Members an Open Enrollment Period (the "Liquidation Order"). The court found that liquidation was "in the best interest of the receivership estate, members, creditors and parties of interest."

Under the Rehabilitation Order, the court granted RRC "the power to affirm or disavow, continue or cause to be rewritten, any contract to which EVERGREEN is a party, provided however that [RRC] shall not be deemed to have affirmed any contract without [RRC] having done so in writing." The Liquidation Order stated similarly that RRC "shall continue to have" that same power.

## C.    The Second Amendment To The Lease.

RRC reached out to BCD in September 2017 to amend the lease in light of Evergreen's liquidation proceedings. The parties dispute the nature of the negotiations (more on that below), but on September 28, 2017, BCD and Evergreen entered into a second lease amendment (the "Second Amendment"). The Second Amendment acknowledged that "Evergreen a) has fallen into financially hazardous condition, b) the Commissioner applied for and was granted a court order to liquidate Evergreen, [and] c) the Commissioner appointed [RRC] as Receiver to liquidate Evergreen . . . ." And by agreement, the lease was amended, "among other things, to provide for [Evergreen] to occupy reduced space and pay reduced rent during the period Evergreen is winding down its business."

Under the Second Amendment, beginning October 1, 2017, Evergreen vacated the Mill Building and retained only a portion of the Warehouse space. In exchange, Evergreen

4

agreed to pay $10,000 per month for three months and then $5,000 per month through December 2018. In addition, certain sections of the original lease were deleted, including the early termination clause in section 1.03, and RRC was added to the notices section of the lease. BCD had "the right to relocate [Evergreen] within the Property if there is space available, so long as [t]he relocated space is reasonably suited to [Evergreen's] needs at the time of relocation" and BCD had the right to show the Property to secure a new tenant. Importantly, the Second Amendment provided that the security deposit "shall be returned to [Evergreen] at the conclusion of the lease term" ending December 2018. David F. Tufaro, as managing member of BCD, signed the amendment on its behalf.

### D.     BCD's Claim Against The Receivership.

The circuit court also entered an order establishing a bar date of July 31, 2018 for creditors to submit claims against Evergreen. The court required RRC to mail proof of claim forms on or before April 2, 2018 "to each person or entity on the Potential Claimants List . . . ." The court also required that "[i]n addition to the mailing, notice of the Bar Date and a blank Proof of Claim Form will be posted on Evergreen's website maintained by [RRC] and [RRC] will provide notice by publication in The Baltimore Sun."

RRC sent the Proof of Claim to BCD using the same address used for the payment of rent (albeit not the address contained in the original lease), 6301 North Charles Street, Ste. 2, Baltimore, Maryland 21212, the address of BCD's property manager, Thornhill Properties, Inc. RRC also published a notice in *The Baltimore Sun* on April 22, 2018.

Over a year-and-a-half later, in a letter dated December 9, 2019, Mr. Tufaro, on behalf of BCD, wrote to the circuit court asking that RRC pay Evergreen's back rent with

interest, a total of over $1,700,000. BCD alleged that it was denied due process in the appointment of RRC as receiver because it didn't have notice or the right to object and because RRC ultimately was given the power to "affirm or disavow" contracts in the Rehabilitation Order. Relatedly, BCD asserted that "MIA, an agency of the Maryland State Government, was a party to this Order and the contents thereof. As such, this was an action of the government violating our due process rights . . . which supersede Maryland statutory law." BCD asked the court to void the Second Amendment because it "was executed under a classic legal case of economic duress that beg[a]n[] with the Court Order that [the court] signed granting the Receiver unlimited authority to disavow any contract that Evergreen had executed." BCD asked the court to declare the Second Amendment "null and void" and to order RRC to pay BCD back rent with interest. Its demand letter to RRC for payment was attached.

The court, treating the letter as a filing by "a potential claimant who might not have understood the process in place," forwarded it to counsel for RRC. In response, on February 5, 2020, RRC filed a motion "for an Order (A) requiring [BCD] to pay over to [RRC] for a security deposit and purchased furniture, and (B) disallowing claims alleged by BCD against the estate." RRC asserted that BCD held the $37,284.10 security deposit due to it under the Second Amendment and that it was owed an additional $8,000 for furniture left on the premises. RRC requested "$38,324.10 (calculated as the Security Deposit, plus the Furniture Sales Price, less the Alleged Repair Costs)."

BCD opposed the motion and filed a separate claim for unpaid rent and termination fees under the original lease and First Amendment, along with "[o]ther [a]ssociated

6

[c]osts." BCD argued again that the Second Amendment "was entered into by BCD under economic duress, and therefore is null and void. Accordingly," BCD argued, "Evergreen owes BCD in excess of $1.7 million under the terms of the Lease for unpaid rent and lease termination fees." BCD conceded that it owed RRC $8,000 for furniture, but argued that that amount "needs to be offset against funds owed to BCD by Evergreen." BCD insisted that it had no notice of the delinquency proceedings or the claim bar date, and that the Second Amendment should not be enforced because it was the result of "economic duress."

### E. The Evidentiary Hearing.

On September 23, 2020, the parties appeared (remotely) for an evidentiary hearing. Two witnesses, Patrick Tracy and Eric Scott, testified on behalf of RRC. Mr. Tufaro, managing member of and counsel for BCD, testified on behalf of BCD.[3] Eleven exhibits were admitted.

Mr. Tracy testified first, as a partner and founder of RRC. He explained that once Evergreen went into liquidation, it no longer needed the space it rented from BCD. This left "two options, negotiate with [BCD] for reduced space and reduced rent or . . . move out." RRC hoped to "work with Mr. Tufaro" to stay in the space, but RRC had "a fiduciary responsibility to all stakeholders, including policyholders" to save money when it "did not need all that space."

---

[3] Mr. Tufaro was permitted to testify in narrative form over RRC's objection that the Maryland Rules of Professional Conduct prohibit an attorney from serving as both an advocate and witness. *See* Md. Rule 19-303.7.

Mr. Tracy testified that he contacted Mr. Tufaro by telephone in September 2017 to negotiate for reduced space and rent:

> I'm sure [Mr. Tufaro] knew about the Receivership and—because it was in the press, but I did let him know that we had to modify the lease in order to stay and that was our preference. We had no intention to leave if we could work with him because it was in everybody's best interest, including, I think, Baltimore Cotton Duck and Mr. Tufaro as to basically say we could stay and still pay rent but it's got to be reduced.
>
> And also, that he should probably start right away to look at leasing the facility because we weren't going to need it anyway. So it was in his best interest actually to actively engage in trying to find new tenants for the building.

Mr. Tracy informed Mr. Tufaro that RRC had "the right to cancel the lease and . . . move" and suggested that Mr. Tufaro "check[] the law . . . to make sure what [he] was telling him was accurate," but that's how Mr. Tracy understood the receivership law. One other option was for Evergreen to move to the MIA offices and leave BCD's premises altogether.

According to Mr. Tracy, he and Mr. Tufaro spoke six to eight times over the course of about a week, and "by the time we got to the third or fourth phone call" Mr. Tufaro, who was "understandably upset about the whole process," ultimately was willing to amend the lease. The two met in person at Evergreen's office, where they agreed to "migrate" Evergreen's people from the Mill Building to the Warehouse.

Mr. Tracy testified further that he received the initial draft of the Second Amendment from Mr. Tufaro himself, and that he believed Mr. Tufaro "drew [it] up based on our discussions . . . ." Once the Second Amendment was agreed and signed, Evergreen vacated the Mill Building by October 1st and "allowed Mr. Tufaro to show that to other . . .

8

potential tenants." Mr. Tracy stated that he and Mr. Tufaro agreed to leave Evergreen's furniture in place so new tenants could view the premises fully furnished, which Mr. Tracy viewed as beneficial to BCD. Mr. Tufaro was in fact able to re-lease the Mill Building "pretty quickly" to a new tenant.[4]

Mr. Tracy insisted that he never "threaten[ed] Mr. Tufaro with physical harm" nor did he "perceive that Mr. Tufaro was unable to exercise his free will or judgment" in negotiating the Second Amendment. In Mr. Tracy's view, Mr. Tufaro had the ability to "choose not to amend the lease."

Eric Scott, Director of RRC's Troubled Company Group, testified next about the negotiation of the Second Amendment and RRC's furniture claim. Mr. Scott communicated both with Mr. Tufaro and BCD's property manager about the lease amendment beginning on September 27, 2017. He specified that "Mr. Tufaro drafted the initial draft" of the Second Amendment, which eliminated the early termination fee. Mr. Scott then "provided a redline copy of the second amendment to the lease to Mr. Tufaro by email" and, "after some discussion," Mr. Tufaro accepted the amendments, which included BCD returning Evergreen's security deposit. Mr. Scott described Mr. Tufaro as a "skilled negotiator." Mr. Scott added that Evergreen complied with the terms of the Second Amendment and moved out at the end of 2018 to an office park where it shares space with another insurer in receivership and pays only $1,800 a month in rent. Mr. Scott stated that

---

[4] That lease was signed October 27, 2017, to begin January 1, 2018, and provided that "[r]ent shall be paid to [BCD] c/o Thornhill Properties, Inc., 6301 N. Charles Street, Suite 2, Baltimore, Maryland 21212," the same address where Evergreen sent rent payments.

9

the language in the Rehabilitation and Liquidation Orders giving RRC "the power to affirm or disavow" contracts is "standard Receivership order language" used in "[v]irtually[] every insurance company Receivership across the land."

Finally, Mr. Tufaro testified on behalf of BCD. He clarified that although he is a licensed attorney in Maryland, he has not practiced law since 1978, and was involved in this case as the managing member of BCD, not as an attorney. He stated that he'd been involved in real estate development in Baltimore since that time and has owned the premises involved since 2009. He noted that it was a difficult site to build out and improve and Evergreen occupied the "premier space" in the building. When Evergreen and BCD entered the lease, BCD was required to build out the space, "[a]nd it's a lot of money you expend and that's part of the reason you sign, at least, like a ten-year lease so that you can spread those costs and get a return on that over the course of the lease." He described Evergreen's "phas[ing] into the expanded space," which increased the rent and also required BCD to build out the space.

Mr. Tufaro explained that before the Rehabilitation Order, counsel for Evergreen contacted him in March 2017 (with ongoing discussions through June 2017) to inquire about what the early termination fee under the lease might be. Mr. Tufaro indicated that Evergreen's counsel "kept [him] apprised of what was happening" with Evergreen's financial trouble, including a "potential acquisition" to keep the company afloat. Notwithstanding efforts for an acquisition, Mr. Tufaro was informed that "Evergreen was likely to be placed in rehabilitation."

Mr. Tufaro was "appalled" to learn that the receiver, RRC, had the power to disavow contracts, a power that seemed "over the top" to him. When Mr. Tracy first contacted him, he was "shocked" at the proposal offered and admitted that he "was sometimes . . . noisily upset" during negotiations. He described the nature of the negotiations for the Second Amendment as lopsided:

> I proposed a higher rent. I don't remember exactly but I'm sure it was double or more [than] that. And [Mr. Tracy] did not budge.
>
> And I realized at that time that I had zero leverage. I did consult with a couple lawyers and they said, David, my experience with Receivership-type activity is that you will get nowhere. They—there's—there's no fight that you're going to win on that issue. So I, basically, said look, I—and I do vividly recall Pat Trac[y] suggesting that MIA had some space to offer, which to me, I viewed as a threat. If you don't take my deal, then we're just going to—we're just going to move over to MIA's space.
>
> . . . I'm stuck in this situation where I could not negotiate. They—Pat [Tracy] and Eric [Scott] might have called it a negotiation. It was not a negotiation. I had no other reasonable alternative. There was no consideration given to me for, in my view, of that reduction of rent.

He explained that the Baltimore office market was "in disarray" with "very little leasing" and so he "was under economic duress" to accept and sign the Second Amendment "because the alternative was zero dollars." He admitted that he "wasn't physically threatened" and that he "made a business decision" to accept the Second Amendment so that he "could get something as opposed to nothing."

Mr. Tufaro also testified that he never "receive[d] an official notice of what was going on by the Receiver, including having to provide a claim by a certain date." He

11

explained that his property manager, Thornhill Properties, doesn't always forward mail to BCD that comes to its North Charles Street address. However, on cross-examination he admitted that he received an email on August 1, 2017, which included a copy of the Rehabilitation Order. Finally, Mr. Tufaro conceded that he was able to re-lease the space Evergreen occupied in the Mill Building beginning January 1, 2018, albeit at a lower rent.

### F.     The Court's Memorandum Order.

On July 16, 2022, the trial court entered a detailed Memorandum Order in which it walked through each of BCD's contentions. *First*, the court, finding that BCD "may be considered a creditor," held that BCD's due process claim was without merit because BCD was "entitled to notice *after* the appointment of a Receiver." (Emphasis added.) *Second*, the court enforced the Second Amendment by determining that "there [wa]s no evidence produced of any threat that would constitute economic duress to either the entity [BCD] or to its Managing Partner, David Tufaro." As such, "there [wa]s no evidence of economic duress sufficient to invalidate the Second Amend[ment], which was ultimately drafted by Mr. Tufaro himself." *Third*, the court held that BCD received sufficient notice of the claims procedure, finding that there was "undisputed testimony" that "Terra Nova, a Management Company, receives the lease payments from tenants . . . , including Evergreen" and "the Notice of Claims was mailed by [RRC] to [BCD] at the same address where the monthly lease payments were remitted." The court added that Mr. Tufaro was aware of the proceedings and "he never indicated that he did not have actual notice of the claims procedure and the claims deadline." *Finally*, the court held that it was undisputed that BCD agreed to pay $8,000 for the furnishings.

12

In summary, the circuit court held the insurance receivership statute as applied was constitutional. The court also found that BCD was not "entitled to notice prior to the appointment of a receiver by the court" and that BCD received actual notice of the claim procedure once RRC was appointed. The court ordered BCD's letter stricken as a "late claim" not comporting with the claim procedure. Finally, the court ordered BCD to pay the receivership estate both the security deposit and the $8,000 for the furniture left in the rental space.

BCD's timely appeal followed.

## II.     DISCUSSION

In seeking to overturn the circuit court's enforcement of the Second Amendment, BCD's appeal presents the following issues, which we have condensed and reworded:[5]

---

[5] BCD stated the Questions Presented in its brief as follows:

>    1.      Did the Court err in concluding that Receiver complied with the law governing providing Proof of Claim and Bar Date?
>
>    2.      Did the Court err in concluding that the 2nd Amendment between Receiver and BCD was a valid and enforceable agreement despite (a) the absence of basic tenets of contract law – consideration and free will – and (b) violation of Due Process under the Maryland Declaration of Rights and U.S. Constitution?
>
>    3.      Did the authority granted by the Court's Orders exceed the authority allowed by Maryland law, and violate Due Process under the Maryland and U.S. Constitutions?
>
>    4.      Did the Court err in not making a finding that the State engaged in a taking of property without just compensation for failing to direct Receiver to pay BCD the Termination Fee and

Continued . . .

to allow BCD to retain the security deposit?

5.     Did the Court display the requisite impartiality and open-mindedness in conducting the hearing and rendering its Decision?

The Commission stated the Questions Presented as follows:

1.     Did the circuit court act within its discretion when it granted the Receiver the authority to disavow, or cause to be rewritten, contracts to which the impaired insurer was a party?

2.     Did the circuit court properly determine that Baltimore Cotton Duck was not entitled to prior notice of the filing of the Complaint and Petition for Immediate Order of Receivership by Consent?

3.     Did the application by the court of Title 9, Subtitle 2 of the Insurance Article and Md. Code Ann., Health-Gen. § 19-706 (LexisNexis 2019) comport with the due process and takings clauses?

RRC stated the Questions Presented as follows:

1.     Did the Circuit Court correctly conclude that BCD received notice of the proof of claim bar date in compliance with Maryland Law?

2.     Did the Circuit Court correctly conclude that the Second Amendment was a valid, enforceable agreement?

3.     Was the power to disavow contracts granted to the Receiver in the Circuit Court's orders within the scope permitted by Maryland Law?

4.     Was the Circuit Court correct when it did not find that the State engaged in a taking of property without just compensation by failing to direct the Receiver to pay BCD a termination fee and failing to allow BCD to retain the security deposit?

5.     Did the Circuit Court display the requisite impartiality and open-mindedness in conducting the hearing and in making its decision?

*first*, whether the circuit court erred in concluding that BCD received proper notice of the claims process; *second*, whether the circuit court erred in enforcing the Second Amendment; and *third*, whether the circuit court was biased in its treatment of BCD's claim. In the course of challenging the validity of the Second Amendment, BCD claims that the entire enforcement scheme, including the Department's authority to disavow the lease, is unconstitutional. Spoiler alert: it isn't.

"When an action has been tried without a jury, an appellate court will review the case on both the law and the evidence." Md. Rule 8-131(c). We will not set aside the circuit court's factual findings "unless clearly erroneous." *Id.*; *see also Plank v. Cherneski*, 469 Md. 548, 568 (2020) ("A trial court's findings are not clearly erroneous if 'any competent material evidence exists in support of the trial court's factual findings[.]'") (*quoting Webb v. Nowak*, 433 Md. 666, 678 (2013)). Questions of law decided by the circuit court aren't given deference and are reviewed *de novo. Plank*, 469 Md. at 569 (*citing MAS Assocs. v. Korotki*, 465 Md. 457, 475 (2019)).

### A. The Circuit Court Concluded Correctly That RRC Complied With The Statutory And Constitutional Notice Requirements In The Claims Process.

BCD's *first* contention is that RRC failed to comply with law governing notice of the claims process because RRC sent notice to the address where it sent rent rather than to the address listed in the notices provision in the lease. BCD argues this was a "debilitating error committed in reckless disregard of BCD's civil rights." The MIA responds that "due process requirements were met here as interested parties were made aware of the existence of the receivership and were afforded an opportunity to present objections." BCD admitted

15

that it received a copy of the Receivership Order via email the day after it was entered, but asserts that notice of the claims bar date was "never sent to BCD, and was never received." And, in fact, Mr. Scott admitted that the proof of claim was sent to a different address (the address where Evergreen sent rent payments) rather than the address provided in the notice provision in the lease. The circuit court found that the notice was sufficient.

The Insurance Code provides that within fifteen days of appointment, a receiver is required to provide notice of the delinquency proceeding to policyholders and notice of the possibility "that the insurance of the policyholder may be canceled." IN § 9-214. The Rehabilitation Order, which BCD admits receiving, included language informing BCD that creditor claims would need to be filed in the delinquency proceedings:

> 20. All persons asserting claims against [Evergreen] shall be enjoined from the date of this Order until further Order of this Court . . . from commencing, maintaining or prosecuting any actions or obtaining any preferences, judgments, attachments, liens, or the making of any levy against [Evergreen] . . . , except that nothing in this Order shall prevent any person from filing a claim in this proceeding.

> 21. This Court shall retain jurisdiction over this matter and this Order shall be subject to further Order of this Court.

BCD was on notice of a future claims procedure by virtue of the Rehabilitation Order.

Once liquidation is authorized, the Commissioner must "notify all creditors that may have claims against the insurer to present their claims." IN § 9-212(c)(1)(iv). And in fact, the Code states "notwithstanding any previous notice given to creditors" after the Liquidation Order issued, the Commissioner was required to send additional notice about the claims process. IN § 9-226(a)(2) ("the Commissioner *shall* notify each person that may

have a claim against the insurer that the claim is forever barred unless the person files the claim with the Commissioner at a place and within the time specified in the notice" (emphasis added)). The Insurance Code doesn't dictate expressly how creditors must be notified. Instead, the Code states only that "[t]he notice shall be given in the manner and for the reasonable period of time that the court orders." IN § 9-226(a)(4).

BCD knew at least about the Liquidation Order itself. The Second Amendment, as Mr. Tufaro drafted it, acknowledged Evergreen's liquidation—it stated that "the Commissioner applied for and was granted a court order to liquidate Evergreen, [and] . . . the Commissioner appointed [RRC] as Receiver to liquidate Evergreen . . . ." Moreover, the Rehabilitation Order Mr. Tufaro admits to receiving referenced a claims process. RRC also points out that "[t]he address that BCD claims [RRC] should have used (the one in the lease) was not the address of BCD." Although it turns out the address is the same address as BCD's, the address as it appeared in the lease was for Terra Nova Ventures, "whose relationship to BCD is not clear from the lease," nor is it clear from the record. There was no evidence that RRC knew any other address for BCD, and—since the notice was to be sent "in the manner . . . that the court order[ed]," IN § 9-226(a)(4), rather than provided under the lease[6]—RRC acted reasonably when it sent the notice to the same address where it sent rent payments.

---

[6] Section 16.01 of the original lease provided that "[a]ny notice, demand or other communication *to be provided hereunder* to a party hereto shall be . . . addressed to Terra Nova Ventures, LLC, 1817 Thames Street, Baltimore, Maryland 21231, if directed to [BCD]." (Emphasis added.)

In order to comport with due process, notice must be given in a manner that is "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The record reveals that Mr. Tufaro, and therefore BCD, had actual notice of the delinquency proceedings and the claims process in general. Mr. Tufaro testified that he was aware of the delinquency case from the media and through his ongoing contact with Evergreen's general counsel. He admitted that he received notice of the Rehabilitation Order the day after it was entered and that he knew of the Liquidation Order, which he then referenced when he drafted the Second Amendment. It was reasonable under these circumstances for RRC to send the claims notice to the address where it sent rent payments. The circuit court concluded correctly that BCD received appropriate notice under the statute.

In any event, and although the court ultimately struck BCD's claim as untimely, the court still afforded BCD the opportunity to present its objections and considered BCD's claim and legal defenses substantively in a full evidentiary hearing. And more importantly, BCD had no meritorious claim if the Second Amendment was valid and enforceable, which—as we discuss next—it was.

### B. The Circuit Court Didn't Err When It Enforced The Second Amendment.

BCD seeks *next* to attack the validity of the Second Amendment in three ways: *first*, by arguing that the Second Amendment lacked consideration; *second*, by contending that the circuit court lacked authority to grant RRC the right to disavow Evergreen's contracts,

which "coerced" BCD to agree to the Second Amendment, and *third*, by asserting that the Second Amendment is the unenforceable result of economic duress. We disagree with all three contentions.

### 1. The Second Amendment is supported by sufficient consideration.

"[C]ontracts ordinarily require consideration to be enforceable." *Harford County v. Town of Bel Air*, 348 Md. 363, 381 (1998). Consideration can be supported by either "'a benefit to the promisor or a detriment to the promisee' . . . ." *Id.* at 382 (*quoting Vogelhut v. Kandel*, 308 Md. 183, 191 (1986)). BCD asserts that "[t]here [wa]s no testimony supporting any benefit that BCD received compared to what it had prior to the [Seco]nd Amendment being forced upon it." RRC argues that it gave adequate consideration by agreeing to stay at the Falls Road location at all:

> BCD was given the right to relocate Evergreen to different space, other than the space which it had leased, so that BCD could rent the more desirable space to another tenant. [RRC] also left furniture in place to assist BCD in showing the space. [RRC] agreed to pay, and did pay, approximately $90,000 in rent. [RRC]'s accommodations benefited BCD, as BCD successfully re-leased a portion of the space that had been occupied by Evergreen . . . .

We agree with the circuit court and RRC that the Second Amendment is supported by sufficient consideration. The alternative was for BCD to collect no rent at all; instead, RRC promised to stay on the premises and continue paying rent. BCD agreed to this modification, admitting that "the alternative was zero dollars" and that it was "a business decision" to accept the Second Amendment to "get something as opposed to nothing." "A promise becomes consideration for another promise only when it constitutes a binding

19

obligation," *Cheek v. United Healthcare of Mid-Atl.*, 378 Md. 139, 148 (2003), and here, RRC took on the new binding obligation to continue renting from BCD in lieu of leaving altogether.

> 2. *There was no violation of BCD's constitutional rights when the circuit court granted RRC the right to disavow Evergreen's contracts.*

This brings us to BCD's next contention, that the alternative that BCD might collect no rent at all by virtue of RRC's right to disavow Evergreen's contracts was unconstitutional. BCD contends that "such broad authority . . . violated Due Process and Just Compensation." BCD adds that there is "no language" in the Maryland Insurance Code "that specifically allows the State, through a receiver, to disavow a contract." Finally, BCD asserts that the *ex parte* nature of the delinquency proceedings violated due process and the circuit court erred in holding that BCD didn't have the right to notice prior to RRC's appointment as receiver. We disagree.

*First*, this case does not involve a taking or deprivation of BCD's property. A taking claim lies only when the government takes private property for public use. *Hardesty v. State Rds. Comm'n of State Hwy. Admin.*, 276 Md. 25, 33 (1975) ("The Constitutional prohibition against the taking of private property means taking the property from the owner, and actually applying it to the use of the public." (cleaned up)). A due process claim for deprivation of property can lie only when the government actor directly caused the loss. *See O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 787 (1980) ("[A]n indirect and incidental result of the Government's enforcement action . . . does not amount to a deprivation of any interest in life, liberty or property."). The government did nothing of the

sort here—it merely stepped in to manage Evergreen, with authority of and oversight by the court, to limit harmful consequences to policyholders and the public. BCD's losses flowed from Evergreen's insolvency, not any government act.

*Second*, the Insurance Code grants receivers the right to disavow or amend existing contracts for impaired insurers and this authority is constitutional. Under the Maryland Insurance Code, rehabilitators have the express power to revoke or cancel contracts. *See* IN § 9-212(a)(1)(ii)(1)–(2) (a rehabilitation order shall direct the commissioner "to take possession of the property of the insurer and conduct the business of the insurer under the general supervision of the court; and to take action as the court directs to remove the causes and conditions that have made rehabilitation necessary"); IN § 9-212(a)(2)(ii) (the issuance of an order of rehabilitation "is not grounds for retroactive revocation or retroactive cancellation of a contract of the insurer, unless the rehabilitator revokes or cancels the contract"); IN § 9-212 (c)(1) ("An order to liquidate the business of a domestic insurer shall direct the Commissioner promptly . . . (i) to take possession of the property of the insurer; (ii) to liquidate the business of the insurer; (iii) to deal with the property and business of the insurer in the name of the Commissioner or in the name of the insurer, as the court directs[.]"). These provisions of the Insurance Code grant the Commissioner broad powers to cancel contracts when doing so serves the interest of protecting insurance policyholders and the general public.

*Third*, the court's power to enter the Receivership Order (what BCD (mis)characterizes as an "*ex parte* order") and authorize the Commissioner's power to disavow contracts is constitutional under the U.S. Constitution and Maryland Declaration

21

of Rights. "Maryland's statutory scheme is based, in substantial part, on the Uniform Insurer's Liquidation Act." *PrimeHealth Corp.*, 133 Md. App. at 400; *see* IN § 9-202. "The Uniform Insurers Liquidation Act was enacted in order to avoid the confusion inherent in the forced liquidation of a multistate insurance corporation, especially with regard to assets in foreign jurisdictions." Jay M. Zitter, *Validity, construction, and application of Uniform Insurers Liquidation Act*, 44 A.L.R.5th 683 (1996). Its application avoids potential conflicts between states by "providing consolidated, orderly, and equitable liquidations and securing equal treatment of creditors wherever situated." *Id.*

The U.S. Supreme Court upheld the constitutionality of insurance delinquency proceedings almost a century ago in *Neblett v. Carpenter*, 305 U.S. 297 (1938). There, an insurer entered a rehabilitation plan that substituted existing policies with new company policies "for only a percentage of the face value of their old policies." *Id.* at 303. The alternative was for policyholders to opt out and pursue their claims for breach of their policy contracts against the liquidator of the old company, *id.*, but the liquidation funds would be insufficient for payment of their claims. *Id.* at 304. Policyholders claimed "that the method of liquidation adopted by the Commissioner and approved by the court, even if authorized by the [California] Insurance Code, denie[d] them due process and impair[ed] the obligation of their policy contracts." *Id.* at 303. The Supreme Court held that the policyholders "failed to show that the plan takes their property without due process." *Id.* at 305.

Although Maryland has never had occasion to review the constitutionality of legislation authorizing a receiver of an insurance company to disavow or amend existing

contracts for impaired insurers in order to protect insureds, creditors, and the general public, other jurisdictions have examined the question. The Supreme Court in *Neblett* upheld the Commissioner's total substitution of insurance policies in a rehabilitation plan, which is just one example of disavowing or amending an existing contract in the insurance context. 305 U.S. at 304. The Supreme Court of Pennsylvania "recogni[zed] the validity of the goals sought and the scheme offered by . . . rehabilitation" in its approval of "the broad powers afforded to the [Insurance] Commissioner granted in order to effectuate equitably the intent of the Rehabilitation statutes, i.e., to minimize the harm to *all* affected parties," including the "impairment of contractual rights." *Foster v. Mut. Fire, Marine & Inland Ins.*, 531 Pa. 598, 614 (1992); *see also Kentucky Cent. Life Ins. v. Stephens*, 897 S.W.2d 583, 587 (1995); *In re Scottish Re (U.S.), Inc.*, 274 A.3d 1019, 1035 (Del. Ch. 2022). We agree that there is an important state interest in protecting health insurance policyholders, creditors, and the general public, and that the procedures and powers the Insurance Code affords the Commissioner do not violate the U.S. or Maryland Constitutions.

> 3. *The Second Amendment was not executed under economic duress.*

*Next*, BCD contends the Second Amendment is unenforceable because it was entered into under economic duress. BCD points to California common law for the proposition that "'economic duress' can apply when one party has done a wrongful act which is sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract." But as outlined above, there was no "wrongful act" to coerce BCD into agreeing to the Second Amendment. And even

if there were, the standard in Maryland for economic duress is stricter.

A party claiming economic duress must prove: "(1) [a] wrongful act or threat" by the other party to the transaction, and (2) that "the complaining party was *overwhelmed by fear and precluded from using free will or judgment*." *Meredith v. Talbot County*, 80 Md. App. 174, 183 (1989) (cleaned up) (emphasis added). Mr. Tufaro conceded at the evidentiary hearing that he was not threatened physically and, if anything, that he was the party "noisily upset" during negotiations. He also testified that he "made a business decision" when agreeing to the Second Amendment, that he had an opportunity to consult with other lawyers once he had notice of the delinquency proceedings (the day after the Rehabilitation Order was entered), and that he accepted the Second Amendment so that he "could get something as opposed to nothing." "Mere stress of business" is not duress when RRC "was not responsible for such circumstances." *Shillman v. Hobstetter*, 249 Md. 678, 693 (1968). The trial court did not err in enforcing the Second Amendment.

### C. The Circuit Court Didn't Show Improper Bias In Handling BCD's Claim.

*Finally*, BCD argues that the circuit court "did not display the requisite impartiality and open-mindedness in conducting the hearing and in its Decision." BCD accuses the circuit court of "hostility" toward Mr. Tufaro for serving as BCD's only witness and its attorney in the proceedings, and the court's "repeated demonstrated favoritism" toward RRC's and MIA's counsel. There is no merit to these contentions.

At the outset, BCD's bias arguments aren't preserved. Preserving review of "the conduct and actions of a trial judge during the course of a proceeding in which it is alleged

24

that such conduct is detrimental to a party's case" requires that "the party raises the issue during the trial," such that the record reflects the following four requirements:

> (1) facts are set forth in reasonable detail sufficient to show the purported bias of the trial judge; (2) the facts in support of the claim must be made in the presence of opposing counsel and the judge who is the subject of the charges; (3) counsel must not be ambivalent in setting forth his or her position regarding the charges; and (4) the relief sought must be stated with particularity and clarity.

*Braxton v. Faber*, 91 Md. App. 391, 408–09 (1992). Indeed, "it is incumbent upon counsel to state with clarity the specific objection to the conduct of the proceedings and make known the relief sought." *Id.* at 407. And BCD did nothing of the sort here.

Even assuming the issue was preserved, though, the actions of which BCD complains don't reveal any bias or prejudice. When reviewing a trial judge's alleged bias, and "'assuming the sufficiency of the record, our inquiry is limited to what impact, if any, the trial judge's alleged conduct had on the appellant's ability to obtain a fair trial. We are not here otherwise concerned with adjudication of judicial misconduct.'" *Reed v. Balt. Life Ins.*, 127 Md. App. 536, 550 (1999) (*quoting Braxton*, 91 Md. App. at 405 n.6). Mr. Tufaro made clear repeatedly that he hadn't practiced law in decades and, in our view, the court attempted to accommodate Mr. Tufaro's lack of legal experience and control the proceedings to comport with the rules of evidence and professionalism. "[T]here is a strong presumption in Maryland, and elsewhere, that judges are impartial participants in the legal process . . . ." *Jefferson-El v. State*, 330 Md. 99, 107 (1993) (citations omitted). After careful review of the record, that strong presumption is not rebutted.

25

Unfortunately, Evergreen's business model was not sustainable and the Insurance Commissioner had the challenging task of navigating its liquidation, a process that invariably left many interested parties unhappy. But the Insurance Code provides the framework that protects policyholders first, and BCD's contractual rights had to "yield to legislation in the interest of the general welfare." *Caminetti v. Pac. Mut. Life Ins. Co. of Cal.*, 139 P.2d 908, 917 (Cal. 1943). We affirm the circuit court's findings that BCD received proper notice of the claims process and the court's decision to enforce the Second Amendment and applicable provisions of the Insurance Code, and we hold that BCD failed to demonstrate that the court was biased in its treatment of BCD's claim in the delinquency proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT TO PAY COSTS.**